MEMPHIS PUBLISHING CO., Petitioner,

v.

Ruth Ann NICHOLS and Bobby Lee Nichols, Respondents.

Supreme Court of Tennessee.

July 31, 1978.

Leo Bearman, Jr., Memphis, for petitioner.

Richard J. Ryan, Sr., Richard Joseph Ryan, Jr., Nancy E. Ryan, Memphis, for respondents.

## OPINION

BROCK, Justice.

On June 5, 1971, the following news article appeared in the *Memphis Press-Scimitar*:

"WOMAN HURT
BY GUNSHOT

"Mrs. Ruth A. Nichols, 164 Eastview, was treated at St. Joseph Hospital for a bullet wound in her arm after a shooting at her home, police said.

"A 40-year-old woman was held by police in connection with the shooting with a .22 rifle. Police said a shot was also fired at the suspect's husband.

"Officers said the incident took place Thursday night after the suspect arrived at the Nichols home and found her husband there with Mrs. Nichols.

"Witnesses said the suspect first fired a shot at her husband and then at Mrs. Nichols, striking her in the arm, police reported.

"No charges had been placed."

Ruth Ann Nichols and her husband, Bobby Lee Nichols, filed separate actions, which were consolidated for trial, charging defamation and an invasion of privacy. The crux of plaintiffs' charge is that the article published by the defendant falsely implied that Mrs. Nichols and Mr. Newton, the assailant's husband, were having an adulterous affair, and were "caught" by Mrs. Newton. Plaintiffs charged that "at the time of the publication of the said article the defendant knew, or could have known had it exercised reasonable care, and could have ascertained that the said matters were untrue."

The undisputed proof showed that not only were Mrs. Nichols and Mr. Newton at the Nichols' home but so, also, were Mr. Nichols and two neighbors, all of whom were sitting in the living room, talking, when Mrs. Newton arrived around three o'clock in the afternoon. Hearing a commotion, Mr. Newton went outside to investigate and there his wife fired several shots at him. Mr. Newton then ran behind the Nichols' home whereupon Mrs. Newton entered the house and shot Mrs. Nichols.

A *Memphis Press-Scimitar* reporter, Menno Duerksen, testified that he had written the article in question two days before it was published and that it was his practice to go to the police station about 4:30 a. m. each day to read through the reports in search of a story. Two police reports were written regarding the shooting incident at the Nichols' home although the availability of both reports at the time Mr. Duerksen wrote his story was disputed. The *arrest report* made no mention of any individuals at the scene of the shooting other than Mrs. Nichols, Mr. Newton and Mrs. Newton. The *offense report* included information that Mr. Nichols and two neighbors were also at the house when Mrs. Newton arrived. Both reports indicated that the incident took place in the middle of the afternoon.

Mr. Duerksen testified that "police said" and "police reported," terms he had used in his story, were commonly used by reporters to indicate *either* that the source of quoted information was a direct quote from a police officer *or* that the information was gathered from official police reports. Police officers testified that they had not given an oral interview regarding the incident.

The proof showed that the defendant newspaper printed a follow-up of the incident on July 2, 1971, stating that an assault charge against Mrs. Newton had been dismissed and that the newspaper's original

account of the incident had regrettably failed to state that Mr. Nichols was present and had tried to prevent the shooting.

Mrs. Nichols testified at trial that "[t]he article in the paper has tore up my home and has tore up my children. We had to move. It's tore up my reputation. My friends has turned down on me. People has talked about me. They've talked about my husband. They've talked about my children." She testified that she had changed her telephone number four times because of harassing phone calls she received. "They would call me and say, 'Oh, you finally got caught.' Said, 'How much did they charge—how much did it cost your husband to get the re-writeup in the paper or get the retraction wrote up?' "

One of Mr. Nichols' friends and fellow workers testified that people would talk about Mrs. Nichols. In response to the question of what people said about Mr. Nichols' wife, the witness stated "They said she was a whore."

At the close of all the proof the trial court granted the defendant's motion for a directed verdict on grounds that (1) the matter was not "libel by innuendo," (2) no "fault" had been shown, and (3) that no special damages had been proved. The court indicated uncertainty respecting the correct standard of liability for a newspaper alleged to have defamed a "private" person, in light of the United States Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

The Court of Appeals reversed and remanded for a new trial, holding (1) that T.C.A. § 23–2601 had obviated the need for special damages where the defendant had published an imputation of adultery, (2) that the determination of whether the article was "libelous per se by innuendo" was a question for the jury, (3) that the standard of liability was ordinary care and (4) that there was evidence adduced at the trial from which a jury could find that the defendant did not act with reasonable care under the circumstances. The case was remanded for a new trial.

We granted certiorari to consider the effect of the *Gertz* decision upon the law of libel in this state and its application to this case.

## I

Before the decision in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), libelous statements were considered to be undeserving of first amendment protection. The libel laws of the individual states traditionally had consisted of common-law principles. In *New York Times*, however, the Court departed from the common law, holding that the first amendment protected good-faith critics of the official conduct of public officials from defamation suits:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279, 84 S.Ct. at 726.

In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) the *New York Times* doctrine was extended to defamation of "public figures" involved in "public issues." In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the Court, in a plurality opinion, concluded that the *New York Times* standard of liability also applied in libel actions by "private" individuals against publishers of defamatory statements relating to matters of "public or general concern."

However, in *Gertz v. Robert Welch, Inc., supra,* a majority of the Court concluded that the *Rosenbloom* plurality had extended the constitutional privilege too far and had failed to strike a proper balance between the reputation interests of private individuals and the interests protected by the first amendment. Although the Court did not mandate that the states must abandon the

"actual malice" requirement in actions by private individuals, it did hold that

". . . so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual." 418 U.S. at 347, 94 S.Ct. at 3010.

The Court reasoned that "[t]his approach provides a more equitable boundary between the competing concerns involved," and "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation." *Id.* at 347–48, 94 S.Ct. at 3011. The effect of the Court's holding is to approve an ordinary negligence standard of liability in such cases as one that complies with the requirements of the first and fourteenth amendments.

Moreover, the Court concluded that common-law rules which permit recovery of presumed damages to reputation and the award of punitive damages unduly infringed upon first amendment freedoms.

Concerning presumed damages the Court said:

"For the reasons stated below, we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

"The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to in-

hibit the vigorous exercise of First Amendment freedoms. Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact. More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury. . . . It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." 418 U.S. at 349–50, 94 S.Ct. at 3011.

Likewise, the Court banned recovery of punitive damages unless actual malice is shown:

"We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation. In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused. And they remain free to use their discretion selectively to punish expressions of unpopular views. Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily

exacerbates the danger of media self-censorship, but, unlike the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury." 418 U.S. at 350, 94 S.Ct. at 3012.

In *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court further clarified the applicability of the *Gertz* damage principles. In *Firestone* the Court allowed recovery for mental pain and anguish as the result of the publication of a false statement even though plaintiff had withdrawn her claim for damages to reputation.

## II

The *Gertz* decision permits each of the states to fashion a rule of liability based upon fault that is less than actual malice, so long as it does not impose liability without fault, to govern actions of libel by "private" individuals against media defendants.[1] Some states have continued to apply the actual malice test,[2] while others have adopted an ordinary negligence test,[3] and still others appear to have chosen some kind of middle ground.[4]

The overwhelming response to *Gertz,* however, has been to adopt the test settled upon by the Court of Appeals in this case, *i. e.,* an ordinary negligence standard. As the Kansas Supreme Court said in *Gobin v. Globe Pub. Co.,* 216 Kan. 223, 232, 531 P.2d 76, 83 (1975):

"[P]ersons are generally held accountable for their negligence—the lack of ordinary care either in the doing of an act or in the failure to do something. The whole theory of negligence presupposes some uniform standard of behavior for the protection of others from harm. The norm usually is the conduct of the reasonably careful person under the circumstances."

See also *Restatement (Second) of Torts* § 580B (1977).

In our opinion, there are manifold reasons for adopting the negligence standard. Among these is the fact that the *Gertz* decision points to this result. In *Gertz,* emphasis is placed upon the need to balance freedom of the press with the private individual's right to protection of his reputation. The *New York Times* test of actual malice strikes this balance where public officials or figures are concerned. This conclusion is based on the Court's characterization of public figures as persons who are uniquely able to protect themselves through public rebuttal, and as persons who knowingly expose themselves to an increased risk of defamation. Private individuals, in the

---

1.  In this case, plaintiff is neither a "public official" nor a "public figure." She holds no public office, does not have general fame or notoriety in the community, has no pervasive involvement in public affairs and has not injected herself into a public controversy.

2.  *E. g., Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450 (1975); *AAFCO Heating & Air Conditioning Co. v. Northwest Pub., Inc.,* 321 N.E.2d 580 (Ind.App.1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976).

3.  *Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 560 P.2d 1216 (1977); *Corbett v. Register Pub. Co.,* 33 Conn.Sup. 4, 356 A.2d 472 (1975); *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 543 P.2d 1356 (1975); *Tro-*

*man v. Wood,* 62 Ill.2d 184, 340 N.E.2d 292 (1975); *Gobin v. Globe Pub. Co.,* 216 Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied,* 423 U.S. 883 (1975); *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okl.1976); *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976); *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976).

4.  *E. g. Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (gross negligence).

opinion of the Supreme Court, "are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery." 418 U.S. at 345, 94 S.Ct. at 3010.

In drawing this distinction, *Gertz* makes it clear that the actual malice test would weight this balance too heavily in favor of the press:

> "[W]e believe that the *New York Times* rule states an accommodation between this concern and the limited state interest present in the context of libel actions brought by public persons. For the reasons stated below, we conclude that the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." 418 U.S. at 343, 94 S.Ct. at 3008–09.

One of the arguments used by opponents of the negligence test is that it will subject editors and publishers to such exacting self-scrutiny that it will have a chilling effect upon the constitutional interest in a free, robust flow of information to the public. *E. g., AAFCO Heating and Air Conditioning Co. v. Northwest Publishing, supra.* Obviously, this conclusion is contrary to that reached in *Gertz, i. e.,* that a standard more stringent for the publisher than actual malice is entirely proper to protect both competing interests. *Troman v. Wood, supra,* 340 N.E.2d at 297. Moreover, the overwhelming majority of state courts considering this issue have concluded that no undue chilling effect or self-censorship would result. As was said in *Taskett v. King Broadcasting Co., supra,* 546 P.2d at 86:

> "It is true that greater caution must now be exercised where the subject of a publication is a private person, yet such a rule is totally justifiable in light of the state's overriding interest in providing a realistic remedy to an otherwise helpless private citizen. It cannot be gainsaid that any social value derived through a defamatory falsehood pertaining to a truly private individual is 'clearly outweighed by the social interest in order and morality.'"

■ It is our conclusion that the ordinary negligence standard permitted by *Gertz* for all defamation actions brought by private persons against media defendants, is the only standard of liability that achieves the desired accommodation of first amendment guarantees and the interest in protecting individual reputation. Only this standard "recognizes that the special needs of the private plaintiff require a more stringent standard of liability than is imposed when the plaintiff is a public figure or official who has ready media access and has voluntarily assumed the risk of defamatory comment by placing himself in the public eye." Note, *State Court Reactions to Gertz v. Robert Welch, Inc.,* 29 Vand.L.Rev. 1431, 1444 (1976).

■ In determining the issue of liability the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances. This is the ordinary negligence test that we adopt, not a "journalistic malpractice" test whereby liability is based upon a departure from supposed standards of care set by publishers themselves. *See Troman v. Wood, supra.*

■ In our opinion, the appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it. In answering the question, the jury may rely on its own experience and instincts to determine whether an ordinarily prudent person would have behaved as the defendant did.

### III

Under the common law as applied in this state prior to the *Gertz* decision, defamations were classified as either actionable *per se* or *per quod.* The primary distinction between libel *per se* and libel *per quod* lay in the nineteenth-century development requiring special damages to be plead and proved in libel actions unless the defamatory meaning of the words was apparent on

their face.[5] *See Fry v. McCord Bros.*, 95 Tenn. 678, 33 S.W. 568 (1895); *Continental National Bank of Memphis v. Bowdre Bros.*, 92 Tenn. 723, 23 S.W. 131 (1893); Note, *Libel Per Se and Special Damages*, 13 Vand.L.Rev. 730 (1960). Any libel which was defamatory on its face, *i. e.*, the danger of injury to reputation was apparent from the mere words themselves, has been held to be actionable *per se*. In such cases actual injury has been conclusively presumed by the court.

Words which were defamatory only in the light of certain extrinsic facts [6] were said to be libelous *per quod*. *See Fry v. McCord Bros., supra,* 95 Tenn. at 685, 33 S.W. 568. In the classic case of libel *per quod* the defendant's newspaper falsely published a report that the plaintiff had given birth to twins. Such publication was defamatory in light of the fact that the plaintiff had been married only one month. *Morrison v. Ritchie & Co.*, 39 Scot.L.Rep. 432 (1902).

Since *Gertz* has held that presumed damages are no longer permissible, the *per se/per quod* distinction no longer has any practical meaning. "A uniform requirement for proof of actual damages obliterates these often illogical distinctions, most of them relics from centuries past." Eaton, *The American Law of Defamation Through Gertz v. Robert Welch and Beyond,* 61 Va. L.Rev. 1349, 1434 (1975). We hold, there-fore, that the *per se/per quod* distinction is no longer a viable one. The plaintiff must plead and prove injury from the alleged defamatory words, whether their defamatory meaning be obvious or not.

## IV

Whether the news article published by the defendant newspaper concerning the shooting episode at the Nichols' home was, in fact, understood by readers in its defamatory sense is ultimately a question for the jury. But preliminary determination of whether the article is *capable* of being so understood is a question of law to be determined by the court. *See Restatement (Second) of Torts* § 614 (1977); *Williams v. McKee*, 98 Tenn. 139, 38 S.W. 730 (1897); *Langford v. Vanderbilt Univ.*, 44 Tenn.App. 694, 318 S.W.2d 568 (1959); 50 Am.Jur.2d *Libel and Slander* § 22 (1970). In our opinion, defendant-newspaper's motion for a directed verdict in this case must be resolved in favor of Mrs. Nichols. When read and construed in the sense in which the reader would ordinarily understand it, the clear implication of the article is that Mrs. Nichols and Mr. Newton had an adulterous relationship and were discovered by Mrs. Newton, thus precipitating the shooting incident. If so read, it can hardly be doubted that Mrs. Nichols' reputation would be injured.[7]

---

5. *See* Prosser, *Libel Per Quod*, 46 Va.L.Rev. 839 (1960). *See also* Prosser, *More Libel Per Quod*, 79 Harv.L.Rev. 1629 (1966); Eldredge, *The Spurious Rule of Libel Per Quod*, 79 Harv.L. Rev. 733 (1966).

6. The extrinsic facts must be plead by way of the "inducement" and the defamatory meaning with reference to those facts by way of the "innuendo." The allegation showing that the language is directed against the plaintiff is the "colloquium."

   The word "innuendo" has been a source of confusion in the law of defamation. Frequently, it has been improperly used in its generic sense as the meaning of the inference which may be properly drawn from the words complained of. *See* Eldredge, *Practical Problems in Preparation and Trial of Libel Cases*, 15 Vand. L.Rev. 1085, 1089 (1962).

7. The courts of this state have consistently followed the prevailing common-law practice of construing the allegedly libelous words in their "plain and natural" import. *See, e. g., Continental Nat'l Bank of Memphis v. Bowdre Bros., supra; Fry v. McCord Bros., supra.* Other jurisdictions have followed the seventeenth-century English doctrine of *mitior sensu*, applicable to slander, which required that words be given an innocent construction whenever humanly possible. *See, e. g., John v. Tribune Co.*, 24 Ill.2d 437, 181 N.E.2d 105 (1962), *cert. denied*, 371 U.S. 877, 83 S.Ct. 148, 9 L.Ed.2d 114 (1962); *Johnson v. Campbell*, 91 Ohio App. 483, 108 N.E.2d 749 (1952); *Tulas Tribune Co. v. Kight*, 174 Okl. 359, 50 P.2d 350 (1935); *Ruble v. Kirkwood*, 125 Or. 316, 266 P. 252 (1928); *Manley v. Harer*, 73 Mont. 253, 235 P. 757 (1925); *Dalton v. Woodward*, 134 Neb. 915, 280 N.W. 215 (1938); *Ellsworth v. Martindale Hubbell Law Directory*, 66 N.D. 578, 268 N.W. 400 (1936).

   The art of construing in *mitior sensu* probably reached its zenith (or perhaps its nadir) in

In libel actions the burden of proof rests upon the plaintiff to show defamation and prove damages. He need not show, however, that the statement is false. There is a legal presumption of falsity which the defendant may rebut by proving truth as a defense.

In this case, the defendant newspaper does not assert that Mrs. Nichols and Mr. Newton in truth had an adulterous relationship. Nevertheless, the defendant's principal defense is that all material facts stated in the news article were substantially true, emphasizing in its brief:

"IT IS OF CRUCIAL IMPORTANCE TO NOTE THAT THE RECORD REFLECTS THAT EVERY MATERIAL FACT IN THE ARTICLE QUOTED ABOVE WAS TRUE.

\* \* \* \* \* \*

"Mrs. Nichols *was in fact* treated at St. Joseph Hospital for a bullet wound in her arm after the shooting. A 40-year old woman *was in fact* held by police in connection with the shooting. A shot *was in fact* fired at the suspect's husband. The suspect *did in fact* find her husband at the Nichols' home with Mrs. Nichols. The suspect *did in fact* fire a shot at her husband and then at Mrs. Nichols and *did in fact* strike her in the arm. No charges *had in fact* been placed at the time of the writing of the article."

In our opinion, the defendant's reliance on the truth of the facts stated in the article in question is misplaced. The proper question is whether the *meaning* reasonably conveyed by the published words is defamatory, "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Fleckenstein v. Friedman*, 266 N.Y. 19, 23,

193 N.E. 537, 538 (1937). *See Lawlor v. Gallagher Presidents Report, Inc.*, 394 F.Supp. 721 (S.D.N.Y.1975). The publication of the complete facts could not conceivably have led the reader to conclude that Mrs. Nichols and Mr. Newton had an adulterous relationship. The published statement, therefore, so distorted the truth as to make the entire article false and defamatory. It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true. *See Brown v. First National Bank*, 193 N.W.2d 547, 553 (Iowa 1972).

## V

Under the common law not only was published defamatory matter "presumed" to be untrue but, in many cases, it was "presumed" that the plaintiff suffered damage, even though he proved none and though in fact none may have existed. *See* W. Prosser, *The Law of Torts* §§ 113, 116 (4th ed. 1971).

Before the *Gertz* decision, our common law provided that if the plaintiff prevailed in a libel *per se* action, the jury could award "general" damages to compensate the defamed plaintiff for any proven injury to his reputation, or, in the absence of proof of *actual* injury, could award compensation for the *presumed* injury (including general injury to reputation, personal humiliation, and actual pecuniary loss that could not be specifically proven) which normally would be expected to result from the publication of the statement. *See Fry v. McCord Bros., supra*, 95 Tenn. at 684, 33 S.W. at 570. If proven, "special damages,"[8] such as specific economic or material loss resulting from the

---

the famous case of *Holt v. Astrigg*, 79 Eng.Rep. 161 (1608). In that case the allegedly slanderous language was: "Sir Thomas Holt struck his cook on the head with a cleaver, and cleaved his head; the one part lay on the one shoulder, and another part on the other." The court held that this was not slanderous *per se* because "it is not averred that the cook was killed . . . [N]otwithstanding such wounding, the party

may yet be living; and it is then but trespass." The court was of the opinion that slander "ought to be direct."

8. As mentioned above, special damages are most significant in a case of libel *per quod*. In such cases, the plaintiff has no cause of action at all unless he can prove special damages. If special damages are proven, the plaintiff may then recover general damages.

defamatory statement could also be awarded to a plaintiff entitled to general damages. And, upon a finding that the statement was published with actual malice, punitive damages could be assessed. *See generally*, D. Dobbs, *The Law of Remedies* § 7.2 (1973).

T.C.A., § 23–2605, requires a plaintiff in a libel action to notify a defendant newspaper or periodical of the alleged defamatory statements and provides:

> "If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of facts, and that there were reasonable grounds for believing that the statements in said article were true, and that . . a full and fair correction, apology, or retraction was published . . . then the plaintiff shall recover only actual, and not punitive, damages . . . ."

Now, however, as we have noted, *supra*, *Gertz* restricts damages to compensation for "actual injury," and unless "actual malice" is shown, punitive damages are not to be permitted and compensatory damages must be proved, not presumed.

In light of the conclusions we have reached, Mrs. Nichols' libel suit is remanded to the trial court for a new trial. Mr. Nichols' suit for libel is dismissed. Both invasion of privacy actions are dismissed as being without merit. *See* Note, *The Invasion of Privacy by Defamation*, 23 Stan.L. Rev. 547 (1971). Costs are taxed against petitioner.

HENRY, C. J., and FONES, COOPER and HARBISON, JJ., concur.