Richard L. WINDSOR, Plaintiff-Appellee,

v.

The TENNESSEAN, John Seigenthaler, Wayne Whitt & Carol Clurman, Defendants-Appellants.

Court of Appeals of Tennessee, Western Section, Nashville.

April 26, 1983.

Rehearing Denied May 16, 1983.

Permission to Appeal Denied by Supreme Court July 25, 1983.

---

Alfred H. Knight, Nashville, for defendants-appellants.

Robert L. Huskey, Manchester, for plaintiff-appellee.

HIGHERS, Judge.

This is an interlocutory appeal by the defendants from an order of the trial court denying summary judgment to them on the plaintiff's claim for libel.

## I.

The plaintiff, Richard L. Windsor, sued the defendants for libel, malicious interference with employment, outrageous conduct, and conspiracy. The denial of summary judgment related only to the libel claim, but defendants contend (and plaintiff de-

nies) that the libel action is dispositive of all claims asserted by the plaintiff. The only question before us is whether there is any genuine issue of material fact on the libel claim so as to preclude summary judgment in favor of the defendants. Rule 56, Tenn.R. of Civ.P.

The plaintiff, a former Assistant United States Attorney, alleges that *The Tennessean,* a Nashville newspaper, and its publisher, managing editor, and reporter published defamatory statements and false innuendos against him. The defendants filed motions to dismiss, which were converted to motions for summary judgment, contending that the statements were non-defamatory, were substantially true, and were privileged under the rationale in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in that the plaintiff is a public figure. The trial court denied all motions, and from that action this appeal is taken.

## II.

The articles under consideration related to activities of the plaintiff in his official capacity as Assistant United States Attorney, and the plaintiff concedes for purposes of this lawsuit that he was a public figure at all relevant times. The principal headlines and statements of which the plaintiff complains are as follows:

1. JUDGE EXPRESSES CONCERN OVER LAWYER'S ACTS—U.S. District Court Judge Thomas Wiseman expressed grave concern from the bench yesterday about actions of a federal prosecutor who subpoenaed himself before a grand jury, apparently to subvert a court order ...

The controversy in connection with Windsor centers on his actions last December, when under a court order to suppress the evidence, he signed a subpoena ordering himself to appear with the evidence before the grand jury. Subsequently, he told the court that the documents which had been subpoenaed could not be turned over to the defendants because they had been called for by the grand jury... At another point during the hearing, the judge appeared distressed when Windsor testified that he had conducted no personal contacts with representatives of Capital Life ... when [adversary counsel] produced a letter from ... counsel for Capital Life addressed personally to Windsor and including the words "pursuant to our telephone conversation," Wiseman called a recess and told the prosecutor to produce the documents he had received from Capital Life.

Windsor later said that he refreshed his recollection and had contacts with the Capital Life lawyer. (July 11, 1980).

2. SUBPOENA INQUIRY—JUDGE AGAIN GRILLS WINDSOR—U.S. District Judge Thomas L. Wiseman grilled Assistant U.S. Attorney Richard Windsor angrily for the third straight day yesterday about activities Wiseman had indicated might constitute "prosecutorial misconduct." ...

Ordinarily, such evidence—once it was ordered suppressed—would have been returned to the defendants. But in this case, it was not.

Instead, Windsor signed a subpoena ordering himself to appear with the evidence before the federal grand jury...

It was at this point, during testimony earlier in the week, that Wiseman said he smelled "prosecutorial misconduct." And, in fact, attorneys for the defendants have asked for a mistrial because of what they term "prosecutorial misconduct by abuse of the grand jury." (July 12, 1980).

3. U.S. ATTORNEY'S OFFICE IS PLACED UNDER A CLOUD (Editorial)—When a federal judge expresses fear that the office of the U.S. District Attorney has engaged in "prosecutorial misconduct," his words should be of grave concern to all who believe that law is the glue that holds the system of justice together ... By putting the documents under grand jury seal the prosecutor took the evidence out of the reach of the court and thereby subvert-

ed a ruling that would have gone against him . . .

Again, Mr. Windsor was required—and allowed—to refresh his memory as to whether he ever had personal contacts with representatives of an out-of-state insurance company involved in the case. Initially, he testified he had never had such personal contacts. Then a letter was introduced, addressed to him by name, from the insurance company's counsel. It discussed the case. That letter also referred to a personal phone call the insurance firm's lawyer had conducted with Mr. Windsor . . .

On Friday, the judge threw Mr. Windsor's insurance fraud case out of court, fearing that the manner in which the attorney handled it would leave "a cloud over the case." (July 20, 1980).

4. QUITTING PROSECUTOR DISPUTE–RIDDEN—During three intense days on the stand, Windsor told Wiseman he had issued a subpoena on himself as a means of subverting a court order issued by Chief U.S. District Judge L. Clure Morton . . .

Hardin [the United States Attorney] said he was enraged when he found out that Windsor testified in court about the assistant attorney's attempts to block the chief judge's court order. (August 5, 1980).

5. U.S. REOPENS CONTROVERSIAL FRAUD CASE—[Defense counsel] accused federal prosecutors pursuing the case of the same tactic for which Wiseman reprimanded Windsor in July—trying to subvert the judicial system. (September 10, 1980).

6. Sources say that outgoing Assistant U.S. Attorney Richard Windsor initially refused to comply with Blanton's request for a transcript. (September 26, 1980).

These excerpts set forth the principal passages that are germane to the claim made by the plaintiff.

### III.

It is the contention of the plaintiff that the published statements are clearly defamatory and that they are either knowingly false or they manifest a reckless disregard for the truth, and that the meaning reasonably conveyed by the language is both false and defamatory. On the other hand, it is the position of the defendants that the statements are non-defamatory or substantially true or constitutionally privileged.

The landmark case involving "a libel action brought by a public official against critics of his official conduct" is *New York Times Company v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Supreme Court noted that there is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (Citations omitted). 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686. In order to assure that the press will not be hampered or intimidated in its investigation, reporting, or commenting upon official conduct, the Court fashioned a rule, based upon constitutional guarantees, which precludes a public official from collecting damages for a defamatory falsehood related to his official conduct unless the statement was made with "actual malice." The statement of the Court is as follows:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

376 U.S. 254, 279, 280, 84 S.Ct. 710, 725, 726, 11 L.Ed.2d 686.

In *Press, Inc. v. Verran,* 569 S.W.2d 435 (Tenn.1978), Justice Henry, speaking for our Supreme Court, stated that "the Supreme Court of the United States has constitutionalized the law of libel and, in material particulars, has preempted state statutory and decisional law in cases and contro-

versies involving the communications media." The Court also made reference to Article I, Section 19, of the State Constitution, which states:

That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

The Court then commented: "To the extent of this controversy this is a substantially stronger provision than that contained in the First Amendment to the Federal Constitution . . . in that it is clear and certain, leaving nothing to conjecture and requiring no interpretation, construction or clarification." 569 S.W.2d 435, 442. The Court equated "abuse of that liberty" in the Tennessee Constitution with "actual malice" as defined in *New York Times Company v. Sullivan.* In *Press, Inc. v. Verran,* the Court further had this to say at 442:

Only under the most compelling circumstances should the courts place obstacles in the way of the news media, or muzzle or deter their investigative efforts and reporting, even though the end result may be distasteful, despicable and shorn of all sense of fairness. The right of the news media to criticize official conduct is limited solely to their answerability for actual malice, which means that the publication was made with knowledge of its falsity or with reckless disregard for the truth.

In *Greenbelt Cooperative Publishing Ass'n. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a developer was seeking certain zoning variances on property he owned, while at the same time the city was attempting to purchase other land owned by him for the construction of a new high school. Public meetings on the negotiations evoked considerable controversy, and the local newspaper reported that some people had called the developer's negotiating position "blackmail." The Court reversed a judgment for the plaintiff, saying: "Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability." 398 U.S. 6, 12, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6. The Court went on to say:

It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.

398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6.

In *Old Dominion Br. No. 496, Nat. Ass'n. Letter Car. v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), a local union described certain non-union members as "scabs" and quoted a definition of the term which said "a SCAB is a traitor to his God, his country, his family and his class." The Court said:

The definition's use of words like "traitor" cannot be construed as representations of fact. As the Court said long before *Linn* [*v. Plant Guard Workers Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)] . . . "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts." [Citation omitted] ". . . However pernicious an opinion may seem, we depend for its correction not on the con-

science of judges and juries but on the competition of other ideas." [Citation omitted].

418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745.

■ Under these holdings, where there is no false representation of fact, one may not recover in actions for defamation merely upon the expression of an opinion which is based upon disclosed, nondefamatory facts, no matter how derogatory it may be. *See* Restatement (Second) of Torts, § 566 (1977).

### IV.

The alleged defamations have been heretofore set forth under six headings, and it is necessary to review these, along with the documentation submitted to the trial judge, to ascertain whether they create a question of genuine material fact.

FIRST: "REFRESHED HIS RECOLLECTION"

■ The plaintiff in his complaint alleges that this report by defendants was intended to suggest that the plaintiff gave "false testimony and committed wilful perjury." The transcript of the trial being covered by *The Tennessean* sets forth the following exchange, in which Mr. Windsor was a witness:

Q. That was the first time you got the documents, or the F.B.I. got the documents from Capital Life in connection with this case?

A. Mr. Farmer, I am certain of that. I am convinced of that . . .

Q. Now, you are certain that the first contact with Capital Life to get records was one, that agents, the F.B.I. agents got the records; and two, it was after October 31st. You said you were certain of that.

A. Yes, sir . . .

Q. [A letter was handed to Mr. Windsor] Mr. Windsor, would you like to change your previous testimony?

A. No, sir. I see what you—I see what the deputy marshall has handed me here. Now—

Q. Let's just read the date and letter to the court, please, before you explain the discrepancy.

THE COURT: What is the date of the letter?

A. It is October 5, 1979. It is written to me by Roger L. Meredith, assistant counsel for Capital Life Insurance Company. In it he says I have enclosed copies of documents held in our files that we discussed over the telephone this Friday afternoon . . .

THE COURT: Mr. Brown, I want you to furnish the court as Exhibit 10–A the enclosures that came with this letter. I will give you a few minutes to go find them. I want to see them right now. Go get them . . .

WINDSOR: Your honor, with Your Honor's permission may I explain my inability to recall this matter?

THE COURT: Yes.

WINDSOR: . . . As I was sitting here answering Mr. Farmer's questions, I honestly had no recollection of it. As we were beginning to leave the courtroom to look for them, Mr. Ruth found it in some materials he brought up from his office.

It is readily apparent that the published language is wholly non-defamatory in this instance for at least two important considerations: *First,* it is not libel to say that a witness "refreshed his recollection" while on the stand. Such a scenario regularly unfolds literally hundreds of times in courtrooms throughout this nation. Refreshing one's recollection is in no wise tantamount to giving "wilful perjury," and no reasonable mind could conceivably draw such a conclusion. In the *second* place, however, it is evident from the trial transcript that the published report was a fair, accurate, and reasonable account of the events which transpired. Mr. Windsor, the plaintiff here, did ask if he could be permitted to explain his *"inability to recall* this matter," and he did state that in answering questions from the stand he *"honestly had no recollection of it."* (Emphasis supplied). Clearly, by his own statements, his recollection was re-

freshed upon examining the letter. It would be an unjustified, unwarranted, and unconstitutional intrusion upon the First Amendment guarantees relating to a free press if we were to hold that this language is an actionable defamation. We do not so hold.

### SECOND: "SIGNED A SUBPOENA"

The complaint alleges that this terminology conveyed the meaning to the reader that Windsor did something which he had no authority to do and that he had, in fact, improperly usurped the function of the court clerk. As a matter of fact, the articles in *The Tennessean* say nothing whatever about the duty and function of the court clerk, and there is no language to suggest that any act of Windsor was a transgression upon the clerk's authority. It is beyond dispute that the average reader would not know or understand the mechanics by which subpoenas are issued, and it more than strains credulity to suggest that the mere characterization that the plaintiff "signed" a subpoena rather than "issued" a subpoena would conjure up the impression which he asserts was made upon the reader.

Returning once again to the trial transcript, we note the following:

Q. Now, Mr. Windsor, this is a subpoena to Assistant United States Attorney, Richard Windsor, commanding you to appear before the grand jury on the 16th day of January.

A. That is correct.

Q. It was issued to you, and it is issued on application of Richard Windsor, Assistant United States Attorney. Are you the same person in both these?

A. Yes, sir.

Q. You are both Richard Windsors? Is that correct?

A. Yes, sir.

Q. You issued this subpoena to be served on yourself through the grand jury for the record that you had that were seized in that back left-hand room on December 15, 1978?

A. Yes ...

It is immaterial that the newspaper stated the plaintiff "signed" the subpoena when, in fact, he "issued" it upon himself. Libel actions, under the law, are not constituted by technical definitions, strained connotations, and misplaced or even mistaken verbiage. "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain the charge of libel, no legal harm has been done." *Zoll v. Allen,* 93 F.Supp. 95 at 97, 98 (S.D.N.Y.1950). The applicable test is "whether the *meaning* reasonably conveyed by the published words is defamatory, 'whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" (Citations omitted). *Memphis Pub. Co. v. Nichols,* 569 S.W.2d 412, 420 (Tenn.1978). There is no appreciable difference under these facts in whether the plaintiff "signed" or "issued" the subpoena.

### THIRD: "CLOUD OVER THE CASE"

*The Tennessean* editorialized that Windsor "took evidence out of reach of the court and thereby subverted a ruling that would have gone against him ...". The trial transcript reveals the following colloquy between Mr. Windsor and the Court:

WINDSOR: As I recall, Mr. Farmer, there was a subpoena for myself ...

THE COURT: Which you had issued?

WINDSOR: Certainly.

THE COURT: In order to block a motion to return?

WINDSOR: It hadn't been filed, Your Honor.

Q. You knew it was going to be, didn't you sir?

.    .    .    .    .

I want to know if there is prosecutorial misconduct in this case. I am beginning to smell it. I want to hear some more about it.

.    .    .    .    .

THE COURT: You mean it changed grand juries? You subpoenaed this

stuff before a grand jury that didn't return indictment on it?

WINDSOR: Your Honor, there are a number of grand juries running at the same time. My objective was to—

THE COURT: Keep it out of these people's hands.

WINDSOR: Yes, sir.

THE COURT: That is the reason you did it?

WINDSOR: You see, what I wanted to do is bring the matter to issue before Judge Morton, and I set all this out, and had I known we would go into this, I could have prepared some rather extensive written summary lists for Your Honor today. If I had known we were going into this, I could be prepared to show you exactly—

THE COURT: Mr. Windsor, I think I just heard correctly. I think I just heard you say that you intentionally issued a subpoena to yourself for these records in order to block a motion to return the property. Did you say that?

WINDSOR: No, sir, I wouldn't say it that way, but that is what—

THE COURT: Wait just a minute.

WINDSOR: That is what my intention was.

THE COURT: All right.

WINDSOR: Please Your Honor, do not think that I thought I could block the return of the property. I knew very well. Judge Morton had just squarely ruled against me and suppressed this evidence, and knew very well—

THE COURT: That is what I heard you say, Mr. Windsor. And if that is not prosecutorial conduct [sic], Mr. Brown, I don't know what is . . .

It would be difficult in light of these facts to imagine a more restrained comment upon the official proceedings than that of which plaintiff complains. We find no basis upon which to hold that the plaintiff has made out an issue upon this claim.

**FOURTH: "SUBVERTING A COURT ORDER"**

The plaintiff avers that there was no court order and that it was false and de-famatory to report that he had subverted an order of court. The distinction here is that the transcript said "you intentionally issued a subpoena to yourself for these records in order *to block a motion* to return the property," while the published report said "*subverting a court order.*" (Emphasis supplied). The test which we have set out heretofore from *Memphis Pub. Co. v. Nichols, supra,* is equally applicable here, and the plaintiff's claim falls far short.

**FIFTH: REFUSED "A TRANSCRIPT"**

The statement that Windsor initially refused to provide a copy of his grand jury testimony to former Governor Blanton is not a defamatory statement, whether it is true or false. It is neither uncommon nor unlawful for lawyers to refuse voluntary discovery to adversaries, even where there are rules or requirements providing for such discovery under the proper circumstances.

## V.

In addition to the foregoing and related claims asserted by the plaintiff, he also relies heavily on the case of *Memphis Pub. Co. v. Nichols, supra.* We do not believe that *Nichols* is in conflict with the legal precedents which we have cited or that it is supportive of the plaintiff's case. In that case the trial court granted summary judgment for the newspaper on the basis that all material statements in the published report were literally true. The article said Mrs. Nichols was shot in the arm after a woman assailant "arrived at the Nichols home and found her husband there with Mrs. Nichols." The newspaper failed to report that Mr. Nichols and two neighbors were also present. The Court reversed and held that it was not sufficient that all material facts stated in the news article were substantially true. The Court held: "The proper question is whether the *meaning* reasonably conveyed by the published words is defamatory . . . Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true." 569 S.W.2d 412, 420.

The *Nichols* case states well the principle that there can be misrepresentation by

omission as well as by direct statement and that words which are substantially true can nevertheless convey a false meaning (e.g., that Mrs. Nichols and the assailant's husband were engaged in an illicit relationship). The facts in the case under review are in no way related to the principles enunciated in *Nichols.* As we have seen by a detailed analysis of the allegations of the complaint, there are no direct statements, no omissions, and no implied meanings other than those arising out of a substantially true or non-defamatory recital of the events upon which the news stories are based.

## VI.

■ It is necessary to underscore the definition of "actual malice" as it pertains to cases involving public figures. Tennessee has adopted Section 580 A of the Restatement (Second) of Torts (1977), which reads as follows:

> *Defamation of Public Official or Public Figure.* One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he
>
> (a) knows that the statement is false and that it defames the other person, or
>
> (b) acts in reckless disregard of these matters.

*Press, Inc. v. Verran,* 569 S.W.2d 435, 442 (Tenn.1978).

The plaintiff makes certain allegations in his complaint regarding the "malicious purpose" of the publisher of *The Tennessean.* Liability is not predicated, however, upon "hatred, spite, ill will, or desire to injure" on the part of a defendant, but only upon the "knowledge of falsity or reckless disregard of the truth" standard. *See Old Dominion Br. No. 496, Nat. Ass'n., Letter Car v. Austin, supra,* 418 U.S. at 281, 94 S.Ct. at 2780. No fact issue on this allegation has been made out by the plaintiff.

## VII.

We are mindful of the stringent requirements which apply to the granting of summary judgments. Summary judgment ought never to be granted where there is a genuine issue as to a material fact, Tenn.R. of Civ.P. 56.03, or where there is uncertainty as to whether there may be a dispute concerning material facts. *Evco Corporation v. Ross,* 528 S.W.2d 20, 25 (Tenn.1975). Where there are no disputed material facts, however, summary judgment is proper "to provide a quick, inexpensive means of concluding cases . . ." In this case the trial judge denied the motion for summary judgment, but upon review and after giving great deference to his ruling, we are unable to find any disputed issue of material fact upon any of the plaintiff's claims which would justify submitting this case to a jury or other trier of fact. The determination of whether a published report is *capable* of a defamatory meaning is a question of law for the court. *Memphis Pub. Co. v. Nichols, supra,* at 419.

Accordingly, we reverse and direct that summary judgment be entered for the defendants on the libel claim. The matter is remanded to the trial court for entry of the judgment and consideration of other pending claims. Costs of this appeal are adjudged against the appellee.

NEARN, P.J. (W.S.), and TOMLIN, J., concur.