## S. Steve Salvo *vs.* Ottaway Newspapers, Inc.

No. 01-P-676.

Essex. November 18, 2002. - January 29, 2003.

Present: Duffly, Kafker, & Green, JJ.

*Libel and Slander. Practice, Civil,* Summary judgment.

In an action for defamation against the owner of a newspaper brought by the plaintiff, a former city councillor and brother of a former mayor of the city who claimed that the newspaper defamed him in an article suggesting that he had improperly used political influence in a certain land transaction, the judge erred in denying summary judgment on behalf of the owner of the newspaper, where the allegedly offending article gave a substantially accurate description of a matter of public concern, and where the gist of the article did not impute misconduct to the plaintiff but rather allowed the readers to make up their own minds about the matters at issue. [259-263]

Civil action commenced in the Superior Court Department on November 6, 1997.

The case was heard by *Diane M. Kottmyer,* J., on motions for summary judgment.

*Roger D. Matthews* for the defendant.

*Edmund C. Smith* for the plaintiff.

Kafker, J. Reading between the lines of a Salem Evening News article, the motion judge concluded that possibly defamatory inferences might be drawn from the facts reported and, so, denied summary judgment for the media defendant in a defamation action brought by the plaintiff, S. Steve Salvo.[1] Salvo, a former city councillor and brother of a former mayor of Salem, claimed that the newspaper defamed him in its article regarding his family's plans to build two houses on undeveloped

[1]The defendant, Ottaway Newspapers, Inc., is the owner and publisher of the Salem Evening News. A single justice of this court allowed the defendant's petition, pursuant to G. L. c. 231, § 118, for leave to file an interlocutory appeal.

waterfront property by suggesting that he had improperly used political influence in an earlier waterfront land transaction. We conclude that the allegedly offending news article gave a substantially accurate description of a matter of public concern and that the gist of the article did not impute misconduct to the plaintiff but rather allowed the readers to make up their own minds about the matters at issue. We therefore reverse the motion judge's decision denying summary judgment to the media defendant.

I. *The newspaper article.* The Salem Evening News, on December 17, 1996, published an article written by Michael Cohen entitled "Controversial plan to build at river's edge is headed for Planning Board." What was at issue, the newspaper reported, "is a plan by relatives of former Mayor Anthony Salvo to build two homes on a sliver of land at the edge of the Forest River salt marsh. Opponents say the project will hurt the delicate ecosystem of the marsh, and perhaps cause flooding." The article then quoted a neighbor who expressed concern that "if the two homes are built, that could open the door to more development along the river." Continuing, the article reported that the planning board was "set to take a final vote on the project that week," but that the local board of health had requested more time to consider the proposal. The lawyer for the project was quoted in the article as saying "[t]he Salvos have met all requirements to construct one single-family home on each of the two lots . . . Accordingly, we request that the special permits sought by the Salvos be granted." The plaintiff does not take issue with any of these statements.

The plaintiff initially appears by name in the middle of the article where it is reported that "[t]he project was first proposed in 1989 by Steve Salvo, a former city councilor and brother of the former mayor." The article then indicated that the project "has since been taken over by Steve's children, Joyce and Tim Salvo."

This statement was followed by the paragraph that is the subject of the defamation action. In its entirety, the paragraph reads as follows: "It wasn't the first time Steve Salvo sought to build on marginal land. In the mid-1980's, he succeeded in getting the city to swap some land with him, and he developed a

home off Riverbank Road on what was thought to be unbuildable wetlands."

The article then gave additional details on the "current" proposal, explaining that the city conservation commission had denied the request but that the Salvos then had successfully overturned that denial by appeal to the State Department of Environmental Protection. Earlier in the article, the newspaper had reported that "when the city has tried to block the plan, the Salvos have appealed to the state and won."

The article concluded that if the planning board rejected the project, the Salvos had the right to appeal the decision to the Superior Court. Salem's mayor, who opposed the project, was then quoted as saying, "the city will be prepared to do battle in court."

II. *Additional facts not contained in the article.* Salvo's brother was mayor of Salem from January, 1984, to December, 1989. The land swap described in the article as having occurred in the "mid-1980's" was completed in late October, 1983.[2] The details of the October, 1983, land transaction were not included in the article. We set them out below.

The Riverbank Road property had been purchased in 1982 by the plaintiff, his wife, and his daughter, in hopes that the daughter and her then husband would be able to build a home there for themselves. After the daughter's marriage failed, the property was put under a conditional sale agreement in January, 1983, to John and Pamela Keane, with the sale dependent upon the Keanes having the necessary building permits, including a wetlands-flood hazard district special permit.

As further explained by the motion judge, "In 1978, certain property on Riverbank Road had been taken through eminent domain by the City of Salem. Deficiencies in the Order of Taking created confusion as to the boundaries between the property which was the subject of the Order of Taking and the property [subsequently acquired] by the Salvos . . . and a question as to whether the [Salvos] had title in fee simple. On October 3,

---

[2] In his letter to the Salem Evening News seeking a retraction or apology, the plaintiff did not address the date of the transaction or reference his brother's term as mayor. He stated simply that he had never swapped land with the city.

1983, before the Salvos conveyed the property to the Keanes, the Salvos and the City executed 'corrective' deeds which clarified the boundaries of the property taken by the City and conveyed a portion of the lot to the City as agreed by the Keanes." The Salvos conveyed 26,897 square feet to the city, and the city conveyed 18,115 square feet to the Salvos. The attorney "who represented the Salvos in the transaction [] dealt with City officials in connection with resolving the issues raised by the Order of Taking, including the exchange of corrective deeds." He also helped on permitting issues.

The Keanes then built a house on the property. As to whether the land "was thought to be unbuildable wetlands," as the newspaper reported, the record appendix includes minutes of a July 21, 1983, Salem planning board meeting in which three citizens, including two who lived on Riverbank Road, had "expressed some concern as to whether the lot was actually buildable."

III. *The Superior Court decision.* The motion judge concluded that "[a]s a matter of law, inferences which might reasonably be drawn from the statements complained of in this action are capable of a meaning which is defamatory." The key inference the judge appeared to rely on is that the land swap occurred while the plaintiff's brother was mayor. She explained the inference as follows: "The description of the plaintiff as a brother of the former Mayor who served on the City Council, combined with the statement that in the mid-1980's [while his brother was Mayor], plaintiff 'succeeded in getting the city to swap some land with him and he developed a home off of Riverbank Road on what was thought to be unbuildable wetlands' could reasonably be found to suggest the improper use of political influence to secure a benefit from the City that plaintiff would not have otherwise obtained. Whether the statement is actually defamatory is a question of fact for the jury."

The motion judge stressed two additional aspects of the news story which might also have misled readers. While the article stated that the "[plaintiff] developed a home off Riverbank Road," the judge remarked that "[t]he plaintiff did not build a home on the property." She also stated that the comments by three citizens at the planning board meeting were the only

factual support for reporting that the land was "thought to be unbuildable."

Finally, she concluded that the fair report privilege "does not protect statements, made in the context of a report about government action, that do not describe the government action" and that the "plaintiff's status as a public figure is a question for the jury to answer."[3]

IV. *Discussion.* We begin with the recognition that "[s]ummary judgment procedures are especially favored in defamation cases." *Dulgarian* v. *Stone*, 420 Mass. 843, 846 (1995), quoting from *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940 & 962 (1988). "Allowing a trial to take place in a meritless case 'would put an unjustified and serious damper on freedom of expression.' Even if a defendant in a libel case is ultimately successful at trial, the costs of litigation may induce an unnecessary and undesirable self-censorship." *Ibid.* Nonetheless, defendants in a defamation case "must still meet the usual burden under [Mass.R.Civ.P. 56, 365 Mass. 824 (1974),] of demonstrating by evidence 'considered with an indulgence in the plaintiff's favor' the absence of disputed issues of material fact and their entitlement to judgment as a matter of law." *Mulgrew* v. *Taunton*, 410 Mass. 631, 633 (1991).

The newspaper report here addresses a matter of public concern: the Salvos' proposal to build two houses on undeveloped waterfront land in Salem raises neighborhood concerns and environmental issues and also involves clashing positions of the current mayor and family members of a former mayor and ex-city councillor. For this reason, "the plaintiff[] must prove not only that the statements were defamatory but also that they were false." *Dulgarian*, 420 Mass. at 847. This double burden on the plaintiff applies to newspaper articles about private figures as well as public figures where the articles report matters of public concern as this article does. *Philadelphia Newspapers Inc.* v. *Hepps*, 475 U.S. 767, 777 (1986) ("the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern"); *Shaari* v. *Harvard*

---

[3]We need not reach the public figure question, as opposed to the public concern question, to decide this case.

*Student Agencies, Inc.*, 427 Mass. 129, 132 (1998); *Dulgarian*, 420 Mass at 846.

Although the motion judge recognized that the article related to a matter of public concern, it is not clear that this determination influenced her legal analysis. As *Hepps* and its progeny firmly placed the burden of proving falsehood on the plaintiff, the conclusion that the article related to a matter of public concern has direct bearing on summary judgment. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991) ("[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case"). Here, the plaintiff had the burden of proving the offending paragraph false and, if unable to meet that burden, the defendant would be entitled to summary judgment in its favor.

We turn to consideration of the truth or falsity of the allegedly defamatory statements. We conclude that the plaintiff had no reasonable expectation of proving false any of the statements in the article, and therefore summary judgment should have been granted for the media defendant. See and compare *Dulgarian*, 420 Mass. at 847. The factual statements at issue in the news article are confined to two sentences of a single paragraph: "It wasn't the first time Steve Salvo sought to build on marginal land. In the mid-1980's, he succeeded in getting the city to swap some land with him, and he developed a home off Riverbank Road on what was thought to be unbuildable wetlands."

There are no factual errors in the first sentence: on both occasions Salvo acquired undeveloped riverfront land for the purposes of building there a home for a family member. Given the title problems described above on the Riverbank Road property, and the several wetlands and zoning permits required to build on that property, we similarly find no quarrel with the sentence's description of the land as "marginal."

We also conclude that the plaintiff had no reasonable expectation of proving any portion of the second sentence false when that sentence is "examine[d] . . . in its totality in the context in which it was uttered or published." *Foley* v. *Lowell Sun Publish-*

*ing Co.,* 404 Mass. 9, 11 (1989), quoting from *Myers* v. *Boston Magazine Co.,* 380 Mass. 336, 341-342 (1980). The phrase "swap" of "some land" was simply a shorthand reference to the exchange of corrective deeds to settle the boundary between the Salvos' land and land on Riverbank Road taken by the city. This "swap" resulted in the Salvos conveying some 27,000 square feet of their parcel to the city in return for the city conveying back some 18,000 square feet to the Salvos, thereby extinguishing any claim the city might have to the remainder of the parcel. The description of this exchange of "corrective" deeds ("fix[ing] the boundary" in the words of the city-to-Salvos deed) as a "swap" was not inaccurate. Newspaper articles need not and cannot be written with the prolixity or specialized terminology of legal documentation.

There also can be no quibbling with the newspaper's statement that Salvo had "developed a home off Riverbank Road." He acquired the Riverbank Road land, helped secure the necessary permits to build there, and profited from its sale to others (the Keanes) who ultimately built a house there. That the house was built on land "thought to be unbuildable" is also not a demonstrably false statement. Citizens at planning board meetings had "expressed some concern as to whether the lot was actually buildable." Furthermore, the parcel's location next to a tidal river, its possible title problems, and issues with permitting lent further support to the statement. Thus, the plaintiff had no reasonable expectation of proving false the statement regarding possibly unbuildable land.

Finally, the plaintiff argues that the article falsely dated the Riverbank Road property transaction as having occurred "[i]n the mid-1980's." The land transaction with the city was, however, completed in late October, 1983, which is on, if not across, the threshold of the "mid-1980's." Moreover, whether the mid-1980's encompasses October, 1983, is "nonprovable as false." *Dulgarian,* 420 Mass. at 851. The motion judge nevertheless appeared to equate the "mid-1980's" with the period of time when Salvo's brother was mayor. The remainder of the story does not, however, mention the years of his brother's term in the mayor's office. There is no suggestion elsewhere in the article that the exchange of corrective deeds occurred while his

brother was mayor. The article also describes a time more than a decade in the past, which would not be particularly fresh in readers' minds. The challenged statement would have had no different impact on the reader had the precise date of the land deal with the city been included instead of the reference to the mid-1980's.

Furthermore, the article's description of the mid-1980's deed exchange with the city is a report of governmental action, which "need give only a 'rough and ready summary that was substantially correct' in order to qualify for the fair report privilege." *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 783 (1989), quoting from *MiGi, Inc.* v. *Gannett Mass. Broadcasters, Inc.*, 25 Mass. App. Ct. 394, 396 (1988). Such report is fair "if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Ibid.*

In sum, the plaintiff had no reasonable expectation of proving any of the offending paragraph's statements concerning a matter of public concern to be defamatory.

We also do not consider this one of those rare cases in which statements concerning a matter of public concern that are not literally false have been combined in such a manner as may constitute a defamatory falsehood. Cf. *Mihalik* v. *Duprey*, 11 Mass. App. Ct. 602, 604 (1981) ("[i]n other contexts such individually truthful, but inadequately explained, statements might collectively be found to have amounted to a 'half truth . . . tantamount to a falsehood' "). The motion judge here concluded that the article "suggest[s] the improper use of political influence to secure a benefit from the city that the plaintiff would not have otherwise obtained." Nevertheless, when "viewed as a whole, the tenor of the report was accurate" and was not distorted or misleading. *Dulgarian*, 420 Mass. at 848. See *Mihalik, supra* at 606 (statements in newsletter, taken collectively, were "too vague and uncertain, and too fragile in impact" to be defamatory). Contrast *Memphis Publishing Co.* v. *Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) (published statement that included selected facts but omitted other key facts "so distorted the truth as to make the entire article false and defamatory"). The gist of the article does not impute defama-

tory wrongdoing to the plaintiff.[4] Rather, the article provides substantially correct facts and substantially accurate context regarding two waterfront land transactions involving a family with a political history in Salem, leaving it "up to the [readers] to draw their own conclusions." *Dulgarian,* 420 Mass. at 851. Summary judgment is appropriate in this context. *Ibid.*

We therefore conclude that the motion judge erred in not entering summary judgment for the media defendant. We vacate the order denying summary judgment and remand to the Superior Court for entry of an order allowing the motion and for entry of judgment for the defendant.

*So ordered.*

---

[4]See and compare *Tobin* v. *Boston Herald-Traveler Corp.,* 324 Mass. 478, 488 (1949) (gist of publication that Governor was "distributing patronage on the basis of party affiliation" did not suggest or impute solicitation or receipt of bribes); *Mihalik,* 11 Mass. App. Ct. at 606 (in public official case, "falsity . . . has not been established merely because in the aggregate [statements] have an insinuating overtone"); *Gouthro* v. *Gilgun,* 12 Mass. App. Ct. 591, 594 (1981) (political advertisement depicting plaintiff as having been " 'in' under the prior administration," as having " 'picked up' taxpayers' money," and as having " 'grabbed' an abatement" were "too vague to be cognizable as the subject of a defamation action").