IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 17, 2024 Session

FILED
01/08/2025
Clerk of the
Appellate Courts

# PRESTON GARNER ET AL. V. SOUTHERN BAPTIST CONVENTION ET AL.

**Appeal from the Circuit Court for Blount County**
**No. L-21220      David Reed Duggan, Judge**

_____

**No. E2024-00100-COA-R3-CV**
_____

The appellees filed suit against the appellants for defamation, defamation by implication, false light invasion of privacy, and loss of consortium. The appellants moved to dismiss the case, arguing that the ecclesiastical abstention doctrine barred the trial court from exercising subject matter jurisdiction. They also filed petitions seeking to have the case dismissed pursuant to the Tennessee Public Participation Act ("TPPA"). The trial court denied in part the motions to dismiss for lack of subject matter jurisdiction, finding that the ecclesiastical abstention doctrine does not apply to this case. It also denied the TPPA petitions, finding that the TPPA does not apply to this case. Alternatively, it found that the appellees satisfied their prima facie burden under the TPPA burden-shifting framework. We conclude that the trial court erred in finding that the TPPA does not apply to this case and reverse that portion of the judgment. Finding no other error, we otherwise affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court for Blount County Reversed in Part, Affirmed in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

L. Gino Marchetti, Jr. and Matthew C. Pietsch, Nashville, Tennessee, for the appellants, Southern Baptist Convention and the Credentials Committee of the Southern Baptist Convention.

R. Brandon Bundren, Nashville, Tennessee, for the appellants, the Executive Committee of the Southern Baptist Convention and Christy Peters.

Bryan E. Delius and Bryce W. McKenzie, Sevierville, Tennessee; and Joseph E. Costner, Maryville, Tennessee, for the appellees, Preston Garner and Kellie Garner.

# OPINION

## BACKGROUND

The Southern Baptist Convention ("SBC") is a network of independent local churches. The SBC's Executive Committee ("Executive Committee") manages the day-to-day functioning of the SBC. The Executive Committee is a distinct legal entity from the SBC and is governed by a separate board of trustees. However, Executive Committee staff assist SBC committees in fulfilling their duties. One of these staff members, Christy Peters ("Ms. Peters"), is the Committee Relations Manager for the Executive Committee.

The SBC does not exercise any authority over local churches. Instead, each church within the SBC is autonomous and selects its own leaders, adopts its own bylaws, and determines its own policies. Despite this polity, the SBC has the right to determine whether churches are in "friendly cooperation" with the SBC.[1] The SBC's Credentials Committee ("Credentials Committee," together with the SBC, the Executive Committee, and Ms. Peters, the "Appellants") is a standing committee tasked with making inquiries of local churches to consider whether those churches are in friendly cooperation with the SBC. The Credentials Committee is not authorized to investigate sexual abuse allegations or to judge the culpability of the accused; instead, it merely reviews how the local SBC church responded to such allegation and makes recommendations as to whether the church's actions, or inactions, are consistent with the SBC's "beliefs regarding sexual abuse."

In 2021, the SBC created a Sexual Abuse Task Force to "oversee an independent investigation into the [Executive Committee's] handling of sexual abuse allegations." The Task Force hired Guidepost Solutions LLC ("Guidepost") to conduct the investigation and "to establish an 'independent, 24/7 reporting mechanism to facilitate communication either anonymously or otherwise'" regarding sexual abuse allegations against individuals involved in Baptist ministry.

Preston Garner was ordained as a minister in 1999. In December 2022, Mr. Garner was a worship pastor at Everett Hills Baptist Church ("Everett Hills") and was the music director at The King's Academy, a Baptist affiliated school. In early December 2022, a representative of the Credentials Committee called Everett Hills's Senior Pastor, Douglas

---

[1] The Executive Committee and Ms. Peters equate this as being in "good standing" with the SBC. To be in friendly cooperation with the SBC, a church must "(1) have a faith and practice which closely identifies with the SBC's adopted statement of faith; (2) formally approve its intention to cooperate with the SBC; (3) make financial contributions through the Cooperative Program [to] the SBC's Executive Committee for Convention causes or any other Convention entity during the fiscal year proceeding; (4) *not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse*; and (5) not act to affirm, approve, or endorse discriminatory behavior on the basis of ethnicity." (Emphasis in original).

Hayes, and informed him that the Credentials Committee "would be sending Everett Hills a letter concerning an individual associated with Everett Hills." Mr. Hayes requested more information about the subject of the letter, but the representative stated that she could not give him any additional information. Mr. Hayes called the representative approximately a week later to follow up because he had not yet received any letter from the Credentials Committee. The representative again told him that she could not give him any more information and instead gave him Ms. Peters's phone number.

Over the course of approximately the next month, having still not received any letter, Mr. Hayes called Ms. Peters multiple times to request additional information. Eventually, Ms. Peters told Mr. Hayes that the allegation involved Mr. Garner. According to Mr. Hayes:

> In the second or third conversation with Ms. Peters, she informed me that the allegation was sexually related, but she told me she could not give me any more details. I asked if there was a public record for this allegation. She said she could not tell me. I asked if there was a charge made regarding this allegation. She said she could not tell me. I asked if legal proceedings had been initiated relating to this allegation. She said she could not tell me. I told her that this was a serious allegation, and I asked her if she was sure this was a legitimate claim and, further, if she was prepared to send something in writing supporting the credibility of the claim. She then told me that the Credentials Committee would not be bringing this to me if it was not credible, and she advised I would receive a letter soon. I told Ms. Peters that I wanted to help her get to the truth of the matter, but I could not help without more details. Ms. Peters said she could not give any more details. … I again told Ms. Peters I needed the letter concerning the details of this concern, and Ms. Peters again told me I would receive the letter soon.

* * *

> [In early January 2023,] I again contacted [Ms.] Peters by telephone to inform her we still had not received the letter and to inquire again as to when we would receive it. I explained to her that it was Mr. Garner's last week of employment with Everett Hills [because he had accepted a ministry position at another Baptist church], and I wanted to have an opportunity to talk to him before he left Everett Hills. Ms. Peters responded that we would receive the letter soon. I told her this was unfair, and she finally told me that the concern involved contact with a minor. I again asked if there was a police report, and she said she could not tell me. I again asked if legal action had been taken, and she said she could not tell me. She told me that all she could say was that it occurred at another church in North Carolina a long time ago. I told her

- 3 -

that she was not giving me much information, and I needed to have something in writing. I asked again if she was sure this was credible, and she again told me that they would not be sending me a letter if it was not credible.

* * *

At no time during any of my telephone conversations with representatives of the Credentials Committee or through written correspondence from the Credentials Committee was I advised or did I know that the allegation made against [Mr.] Garner was made by an anonymous accuser.

(Internal numbering omitted).

On January 7, 2023, Ms. Peters emailed a letter to Everett Hills (the "Letter"). The Letter notified Everett Hills that it "may employ an individual with an alleged history of abuse" and solicited Everett Hills's response to a series of questions, including, *inter alia*:

> 3. Is [Mr.] Garner currently serving in a leadership position … at [Everett Hills]? If yes, please provide details regarding the placement of Preston Garner in his current role. If no, is the church aware if [Mr.] Garner is currently serving at another church?

> 4. Prior to being contacted by our committee, has the church received any allegations of sexual misconduct involving [Mr.] Garner? . . .

> 5. Is the church aware of an allegation of sexual assault of a minor involving [Mr.] Garner during the time he served at Englewood Baptist Church, Rocky Mount, North Carolina?[2] Has Everett Hills [] had any communication with Englewood Baptist Church?

Notably, Mr. Garner is the only person named in the Letter. Ms. Peters also emailed the Letter to Randy Davis, president of the Tennessee Baptist Mission Board. Upon receipt of the Letter, Mr. Davis forwarded it to The King's Academy. The King's Academy immediately suspended Mr. Garner's employment and prohibited him from being on its campus. Ultimately, The King's Academy terminated his employment. Additionally, at the time the Letter was sent, Mr. Garner had already resigned from his position at Everett Hills and had accepted a position as Legacy Adult Pastor at First Baptist Church Concord ("Concord"). However, Concord withdrew its offer of employment upon learning of the inquiry by the Credentials Committee.

---

[2] The record reflects that Mr. Garner was last employed at Englewood Baptist Church in June 2010.

On May 12, 2023, Mr. Garner and his wife, Kellie Garner, filed a Complaint against the Appellants and Guidepost in the Blount County Circuit Court ("trial court"). They filed an Amended Complaint on June 6, 2023 asserting claims of defamation, defamation by implication, and false light invasion of privacy ("false light"). The Amended Complaint avers that both the Letter and Ms. Peters's oral statements to Mr. Hayes (the "Oral Statements," together with the Letter, the "Statements") were defamatory. It also avers that by "omitt[ing] material facts," the Statements "implied that [Mr.] Garner was guilty of sexual abuse." Finally, it avers that the Statements "painted [Mr. Garner's] character as something or someone he absolutely is not." The Amended Complaint also sets forth a cause of action for Mrs. Garner's loss of consortium with Mr. Garner.

The Appellants moved the trial court to dismiss the Amended Complaint pursuant to Tennessee Rule of Civil Procedure 12.02(1) ("Rule 12"). In their Rule 12 motions, the Appellants relied upon the ecclesiastical abstention doctrine and argued that the trial court lacked subject matter jurisdiction because the Amended Complaint impermissibly asked the trial court to entangle itself into an ecclesiastical question—specifically, whether Everett Hills was in friendly cooperation with the SBC.

The Appellants also filed petitions seeking to have the Amended Complaint dismissed pursuant to the TPPA. They argue that the Letter related to health and safety and/or the community's well-being and, therefore, was a matter of public concern. Specifically, the Executive Committee and Ms. Peters argue that the Letter "is an inquiry . . . into an allegation of sexual assault of a minor by [Mr.] Garner[.]"[3] The Appellants also argue that the TPPA applies because the Garners' claims are based on or in response to the SBC and the Credentials Committee's exercise of their right to free speech and/or the right of association. They next argue that Mr. Garner cannot establish a prima facie case for each essential element of his defamation claim because there is no dispute that the allegation of abuse referenced in the Statements was made; thus, they argue, the statements in the Letter are not false, and his defamation claim is subject to dismissal pursuant to Tennessee Code Annotated section 20-17-105(b). The SBC and the Credentials Committee further assert that Mr. Garner's defamation by implication and false light claims "are simply derivatives of the defamation claim" and therefore should also be dismissed. Additionally, the Executive Committee and Ms. Peters argue that Mr. Garner cannot establish a prima facie case for each essential element of his false light claim because the Appellants did not "give publicity" to the Letter. Alternatively, the Executive Committee and Ms. Peters argue that Mr. Garner cannot show that the Appellants acted with actual knowledge or reckless disregard as to the falsity of the light in which Mr. Garner was placed.

---

[3] Elsewhere in their TPPA petition, the Executive Committee and Ms. Peters argue that the Letter "is an inquiry into the hiring practices of Everett Hills and whether it knew anything about the 'allegations of sexual misconduct involving [Mr. Garner].'"

In response to the TPPA petition, the Garners argued that the TPPA does not apply to their claims because the subject matter of the Letter is not a matter of public concern. Alternatively, they argue that they have established a prima facie case for each essential element of their claim. Specifically, in support of his defamation claim, Mr. Garner argues that the Statements were made "based solely on an uncorroborated, anonymous report to a hotline" and that the Appellants "did absolutely nothing to verify this false statement before repeating the allegation as though it was fact." Alternatively, he argues that the Statements constitute defamation by implication because they "imply and suggest that [he] had actually committed such an assault" or that he "had been or was formerly accused of child sexual assault." Finally, Mr. Garner argues that the fact that the Statements were communicated to his employers brings his claim within the special relationship exception to the publicity element of his false light claim.

The trial court heard the Appellants' Rule 12 motions and TPPA petitions on December 8, 2023. On January 2, 2024, the trial court entered an order denying the Rule 12 motions in part[4] and denying the TPPA petitions in full, stating that it was denying them "[f]or the reasons set forth in the transcript, which is attached hereto as Exhibit A and incorporated herein by reference." Regarding the Rule 12 motions, the transcript includes the following statements by the trial court:

> . . . It has been suggested that the gravamen, the gravamen, as we say usually of this case, is that the [trial court] is being asked to step into the inquiry over whether Everett Hills [] is in friendly cooperation with the SBC. I don't think that is the gravamen of this Complaint.
>
> * * *
>
> . . . This is not something rooted in religious belief or religious doctrine. It can be resolved by applying neutral legal principles. The [trial court] doesn't have to rely on religious doctrine to adjudicate that claim.
>
> * * *
>
> But here, the gravamen of this Complaint is whether or not a tort was committed against [the Garners]. I don't think it involves religious doctrine at all. I don't think the issue before the [trial court] is whether or not Everett Hills is in friendly cooperation with the [SBC]. It is about whether the tort of defamation was committed.

---

[4] The trial court struck five paragraphs of the Amended Complaint, finding that those paragraphs ran afoul of the ecclesiastical abstention doctrine. However, it did not dismiss any of the Garners' claims. The Garners do not appeal the trial court's partial grant of the Rule 12 motions.

Regarding the TPPA petitions, in its written order, the trial court found that the TPPA "does not apply to this case. In the alternative, the [trial court found] that even if the [TPPA] did apply, [the Garners] have carried their burden of proving a prima facie case of each essential element of" their claims. The transcript attached thereto reflects the trial court's reasoning with respect to this finding regarding the Garners' prima facie case:

> Now, with respect to whether there has been a prima facie case made for defamation, whether there was a statement, yes, it is a true statement that there was an anonymous complaint, but I don't think that is all that statement does.

> \* \* \*

> … There is clearly an implicit suggestion here that [Mr.] Garner has been accused of sexual abuse of a minor. Maybe the statement was not made publicly, but if I look at, was it sent to so many persons that the matter must be regarded to be substantially certain to become one of public knowledge …

> … the fact that it spread from A to B to C may work against the [Appellants] in terms of whether or not this communication was sent to so many persons that the matter must be regarded as to become substantially certain to become one of public knowledge.

> And at the same time, I am even more concerned, and I must take as true today, the allegations in this Complaint that this anonymous report under the allegations of the Complaint was not investigated at all. It's just relayed.

> \* \* \*

> The allegation before me today is that there was no investigation at all. I think a prima facie case for false light had been made …

> I'm also, at this stage in the proceedings, I don't think [Mr. Garner] is a public official or a public figure, so we are looking at whether or not he inserted himself or involved himself in a matter of public concern.

> Well, there is no question there is a matter of public concern for the [SBC]. I mean, the sexual abuse news -- I mean, allegation controversy. It has been all over the news. It is a huge public controversy. But did [Mr. Garner] insert himself into that, in any way inject himself into that public controversy?

It seems to me he was injected. He didn't try to involve himself into that public controversy. He was drug into it through no action of his own. …

The Appellants appeal the trial court's partial denial of their Rule 12 motions and the denial of their TPPA petitions.

## ISSUES

The Appellants raise five issues on appeal, which we restate slightly:

1.      Whether the trial court erred in concluding that it had subject matter jurisdiction over claims concerning the Credentials Committee's inquiry into whether Everett Hills was in "friendly cooperation" with the SBC.

2.      Whether the trial court erred in concluding that the TPPA does not apply to the Garners' claims.

3.      Whether the trial court erred in concluding that the Garners established a prima facie case for each essential element of their claims.

4.      Whether the trial court erred in failing to consider whether the Executive Committee and Ms. Peters established a valid defense.

5.      Whether the Executive Committee and Ms. Peters are entitled to an award of their attorney's fees and costs incurred at the trial court, in this appeal, and on remand.

The Garners, in their posture as appellees, argue that the trial court's ruling on the Rule 12 motions is not properly before this Court.

## DISCUSSION

### I.  Ecclesiastical Abstention Doctrine

*a.*

The Appellants argue that the trial court erred in concluding that it had subject matter jurisdiction over this matter and, thus, denying their Rule 12 motions.  Generally, a party is entitled to an appeal as of right only after the trial court has entered a final judgment.  Tenn. R. App. P. 3(a).  It is well-settled that an order denying a motion to dismiss is not a final, appealable judgment.  *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 460 (Tenn. 1995). The Garners argue that the trial court's denial of the Appellants' Rule 12 motions is not properly before this Court because the Appellants did

not seek an interlocutory or extraordinary appeal of that denial. The Garners acknowledge that the TPPA provides an exception to Appellate Rule 3, such that a trial court's order dismissing or refusing to dismiss a legal action pursuant to a TPPA petition is immediately appealable to this Court as a matter of right. Tenn. Code Ann. § 20-17-106. However, the Garners argue that the Appellants cannot use this statute to shoehorn their Rule 12 motions into this appeal.

The Garners are correct that only orders that dismiss or refuse to dismiss a legal action pursuant to a TPPA petition fall within the scope of section 20-17-106. *See Kent v. Glob. Vision Baptist, Inc.*, No. M2023-00267-COA-R3-CV, 2023 WL 8621102, at *2–3 (Tenn. Ct. App. Dec. 13, 2023), *perm. app. denied* (Tenn. Apr. 10, 2024) (holding that an order denying a motion to dismiss that is filed after, and is separate from, a TPPA petition falls outside the scope of section 20-17-106). And it is undisputed that the portion of the trial court's order denying the Appellants' Rule 12 motions does not "dismiss or refuse to dismiss a legal action pursuant to a TPPA petition"; therefore, that portion of the order does not fall within the scope of the TPPA. This limitation notwithstanding, a challenge to subject matter jurisdiction may be raised at any time. *Church of God in Christ, Inc. v. L. M. Haley Ministries, Inc.*, 531 S.W.3d 146, 157 (Tenn. 2017) ("*COGIC*") (citing *Johnson v. Hopkins*, 432 S.W.3d 840, 843–44 (Tenn. 2013); *In re Est. of Brown*, 402 S.W.3d 193, 199 (Tenn. 2013)). *See Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 445 (Tenn. 2012) ("Challenges to a court's subject matter jurisdiction call into question the court's lawful authority to adjudicate a controversy brought before it, and, therefore, should be viewed as a threshold inquiry." (internal citations omitted)).

"[T]he ecclesiastical abstention doctrine, where it applies, functions as a subject matter jurisdictional bar that precludes civil courts from adjudicating disputes that are 'strictly and purely ecclesiastical' in character[.]" *COGIC*, 531 S.W.3d at 159 (citing *Watson v. Jones*, 80 U.S. 679, 733 (1871)). "As such, the ecclesiastical abstention doctrine may be raised at any time as a basis for dismissal of a lawsuit." *Id.* Because the Appellants' Rule 12 motions were premised upon the ecclesiastical abstention doctrine and challenged the trial court's authority to adjudicate this controversy, those motions may be raised at this time.

### b.

"Litigants may take issue with a court's subject matter jurisdiction using either a facial challenge or a factual challenge." *Redwing*, 363 S.W.3d at 445 (citing *Schutte v. Johnson*, 337 S.W.3d 767, 769–70 (Tenn. Ct. App. 2010); *Staats v. McKinnon*, 206 S.W.3d 532, 542 (Tenn. Ct. App. 2006)). "A facial challenge attacks the complaint itself and asserts that the complaint, considered as a whole, fails to allege facts showing that the court has subject matter jurisdiction to hear the case." *COGIC*, 531 S.W.3d at 160 (citing *Redwing*, 363 S.W.3d at 445–46). "In contrast, factual challenges to subject matter

jurisdiction do not attack the allegations of the complaint as insufficient." *Id.* (citing *Staats*, 206 S.W.3d at 543). "Rather, a factual challenge admits that the alleged facts, if true, would establish subject matter jurisdiction, but it attacks the sufficiency of the evidence to prove the alleged jurisdictional facts." *Id.* (citing *Redwing*, 363 S.W.3d at 446; *Staats*, 206 S.W.3d at 543).

The Appellants do not argue that the alleged facts, if true, would establish subject matter jurisdiction. They instead argue that the subject matter of the dispute itself prohibits the courts from exercising jurisdiction over the Garners' claims. Accordingly, the Appellants' Rule 12 motions present a facial challenge to the trial court's subject matter jurisdiction in this case. When evaluating a facial challenge to subject matter jurisdiction,

> a court limits its consideration to the factual allegations of the complaint and considers nothing else. [*Redwing*, 363 S.W.3d at 445–46.] The court presumes the factual allegations of the complaint are true. If these factual allegations establish a basis for the court's exercise of subject matter jurisdiction, then the court must uncritically accept those facts, end its inquiry, and deny the motion to dismiss. *Id.*; *see also Staats v. McKinnon*, 206 S.W.3d 532, 542–43 (Tenn. Ct. App. 2006); *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Thus, when evaluating facial challenges to subject matter jurisdiction, courts are to utilize the familiar analytical framework that applies to motions to dismiss for failure to state a claim. [*Staats*], 206 S.W.3d at 543.

*COGIC*, 531 S.W.3d at 160. "Our standard of review on appeal from a trial court's [disposition] of a motion to dismiss is *de novo*, with no presumption of correctness as to the trial court's legal conclusions, and all allegations of fact in the complaint below are taken as true." *Brown v. Ogle*, 46 S.W.3d 721, 726 (Tenn. Ct. App. 2000) (citing *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997)).

The Appellants argue the trial court lacked subject matter jurisdiction because the Amended Complaint impermissibly asked the trial court to entangle itself into an ecclesiastical question—specifically, whether Everett Hills was in friendly cooperation with the SBC. When determining whether the ecclesiastical abstention doctrine bars a defamation claim made against a church official,

> Tennessee courts must look at whether the slanderous or libelous statements were made during the course of an ecclesiastical undertaking. If made during an ecclesiastical undertaking, such as the discipline or removal of a pastor, then such actions may be found "too close to the peculiarly religious aspects of the transactions to be segregated and treated separately—as simple civil wrongs." However, if done apart from any ecclesiastical undertaking, no

- 10 -

protection may be afforded under the First Amendment, thus subjecting churches to civil liability.

*Ausley v. Shaw*, 193 S.W.3d 892, 895 (Tenn. Ct. App. 2005) (internal citations omitted).

Although there is a dearth of Tennessee caselaw defining what constitutes an ecclesiastical undertaking in this context, this Court has subsequently explained that the ultimate question is

> whether the defamation claims can be determined without running afoul of the First Amendment. That means, can the specific defamation claim alleged herein be adjudicated "without extensive inquiry . . . into religious law and polity" and "without resolving underlying controversies over religious doctrine," *O'Connor v. The Diocese of Honolulu*, 885 P.2d [361, ]368[ (Haw. 1994)], quoting [*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. ]Milivojevich*, 426 U.S. [696, ]709–10[ (1976)]. That includes inquiry into religious law, court examination of religious belief, or court review of the correctness of the church tribunal's decision. If, to resolve the particular claim brought, a court would need to resolve underlying controversies over religious doctrine, then the claim is precluded. *Milivojevich*, 426 U.S. at 709–10.

*Anderson v. Watchtower Bible & Tract Soc. of New York, Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *30 (Tenn. Ct. App. Jan. 19, 2007), *cert. denied*, 552 U.S. 891 (2007) (footnote omitted). As this Court further observed:

> Where defamation claims have survived dismissal when faced with claims of ecclesiastical abstention, the court has generally made a determination that resolution of the specific allegation would not risk prohibited entanglement. For example, [in] *Drevlow v. Lutheran Church Missouri Synod*, [991 F.2d 468 (8th Cir. 1993)], the court found that a minister's defamation claim based on allegations the church circulated a personal information file about him that contained false information about his wife was not precluded by the First Amendment because the church had not offered any religious reason for its actions regarding the file and, consequently, the court would not become entangled in religious controversy. *Drevlow*, 991 F.2d at 472.

*Id.* at *30 n.20.

In fact, this case is similar to both *Drevlow* and *Redwing*. The plaintiff in *Drevlow* brought claims of "libel, negligence, and intentional interference with his legitimate

- 11 -

expectancy of employment" against a synod.[5]  *Drevlow*, 991 F.2d at 469.  The plaintiff alleged that he was injured when the synod placed a document in his personal file that falsely stated that his spouse had previously been married; he further alleged that the synod did not consult with him or verify the accuracy of the information before placing the document in his file.  *Id.*  He claimed that "because churches within the [s]ynod automatically disqualify a minister if his personal file shows that his spouse has been divorced, the [s]ynod effectively excluded [the plaintiff] from consideration for employment as a pastor by circulating this false information."  *Id.* at 470.  The trial court dismissed the case for lack of subject matter jurisdiction, finding that the plaintiff's claim "that the [s]ynod suspended [him] from its list of eligible ministers in violation of its bylaws would require the court to construe [s]ynodical doctrine and to review an essentially religious decision in violation of the First Amendment" and that "any calculation of damages would necessitate a finding of [the plaintiff]'s marketability as a pastor, a matter strictly between the clergy and the church."  *Id.*  The Eighth Circuit Court of Appeals reversed the trial court, concluding that, although the trial court was barred from determining whether the synod violated its own bylaws by removing the plaintiff's name from its list of eligible ministers, it was unclear that the evidence offered at trial with respect to the remainder of the plaintiff's claims would "definitely involve the district court in an impermissible inquiry into the [s]ynod's bylaws or religious beliefs."  *Id.* at 470–71.  Importantly, the Circuit Court noted that the synod "ha[d] not offered any religious explanation for its actions which might entangle the court in a religious controversy in violation of the First Amendment."  *Id*. at 472.  As such, the Circuit Court concluded that the plaintiff was "entitled to an opportunity to prove his secular allegations at trial."  *Id.*

Similarly, in *Redwing*, the plaintiff sued a Catholic diocese "for acts of child sexual abuse allegedly perpetrated by one of its priests[.]"  *Redwing*, 363 S.W.3d at 441.  The plaintiff "alleged that the [d]iocese breached its fiduciary duties and acted negligently with regard to the hiring, retention, and supervision of" the priest, "that the [d]iocese was aware or should have been aware that" the priest was "a dangerous sexual predator with a depraved sexual interest in young boys[,]" and that "[a]fter finding out about [the priest]'s abuse of minors, the [d]iocese actively took steps to protect [the priest], conceal the [d]iocese's own wrongdoing . . . , and prevent [the plaintiff] and other victims of [the priest] from filing civil lawsuits."  *Id.* at 442–43.  The diocese filed a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(1) arguing that the ecclesiastical abstention doctrine barred the trial court from exercising subject matter jurisdiction over the case.  *Id.* at 443.  On appeal, when discussing the scope of the ecclesiastical abstention doctrine, the Tennessee Supreme Court noted:

> In civil cases, the ecclesiastical abstention doctrine is implicated only when the alleged improper conduct that gave rise to the lawsuit is rooted in

---

[5] A synod is "[a]n ecclesiastical council lawfully assembled to determine church matters[.]" *SYNOD*, *Black's Law Dictionary* (12th ed. 2024).

- 12 -

religious belief. Adjudication of disputes by state courts is appropriate in matters involving religious institutions, as long as the court can resolve the dispute by applying neutral legal principles and is not required to employ or rely on religious doctrine to adjudicate the matter.

Adopting a more expansive application of the ecclesiastical abstention doctrine runs the risk of placing religious institutions in a preferred position, and favoring religious institutions over secular institutions could give rise to Establishment Clause concerns. Employing the application of the neutral legal principles approach enables the courts to give no greater or lesser deference to tortious conduct committed on third parties by religious organizations than we do to tortious conduct committed on third parties by non-religious entities.

*Id.* at 450–51 (internal citations omitted). The High Court emphasized that the diocese "ha[d] not asserted any religious foundation for the alleged conduct upon which [the plaintiff]'s claims [were] based." *Id.* at 452. Accordingly, the Court concluded that the plaintiff would be able to pursue his claims "without asking the trial court to resolve any religious disputes or to rely on religious doctrine." *Id.* at 453. "In other words, [the plaintiff]'s claims [could] be pursued based upon breach of a secular duty by the [d]iocese without requiring the court to resolve disputes over religious questions." *Id.*

"While the correct path between the secular and the religious is narrow," *Redwing*, 363 S.W.3d at 445, contrasting these cases with *In re Lubbock*, 624 S.W.3d 506 (Tex. 2021), upon which the Executive Committee and Ms. Peters rely, helps illuminate that path. In *Lubbock*, "the Catholic Bishops of Texas decided to release the names of those clergy against whom credible allegations of sexual abuse of a minor ha[d] been raised." 624 S.W.3d at 510. "To prepare the list, the [local d]iocese's attorney engaged the services of a retired law enforcement professional and a private attorney to review all clergy files for any credible allegations of abuse of minors." *Id.* (internal quotation omitted). "The list, as originally published, did not include the canonical meaning of the term 'minor,' which the [d]iocese assert[ed]—under Canon Law—includes 'a person who habitually lacks the use of reason' and encompasse[d] any 'person deemed vulnerable due to a health or mental condition.'" *Id.* The plaintiff in *Lubbock* was a deacon of his local diocese and was reported to have committed "sexual misconduct" with "a woman with a history of mental and emotional disorders." *Id.* at 509. As a result, he was included on the diocese's list of clergy with a credible allegation of sexual abuse of a minor. *Id.* at 510. The plaintiff took issue with his inclusion on the list in part because the woman with whom he was alleged to have committed sexual misconduct was not a minor child, and he sued the diocese for defamation and intentional infliction of emotional distress. *Id.* at 511. On appeal, the Texas Supreme Court ultimately held that the ecclesiastical abstention doctrine barred the civil courts from exercising subject matter jurisdiction over the case because

determining whether the [d]iocese incorrectly included [the plaintiff's] name on the list would require a court to evaluate whether the [d]iocese "falsely state[d] that [the plaintiff] was and had been 'credibly accused' of sexual misconduct [with] a minor." However, as the [d]iocese informed [the plaintiff], it based the scope of its investigation on the canonical meaning of minor: "a person who habitually lacks the use of reason," which includes "vulnerable adults." Thus, a court would have to evaluate whether the [d]iocese had credible allegations against [the plaintiff] under the canonical meaning of "minor." This would necessarily entail a secular investigation into the [d]iocese's understanding of the term "minor," whether a court agrees that the woman he allegedly sexually abused qualifies as a "minor" under Canon Law, and whether the allegations it possesses were sufficiently "credible."

This inquiry would not only cause a court to evaluate whether the [d]iocese properly applied Canon Law but would also permit the same court to interlineate its own views of a Canonical term.

*Id.* at 515 (internal citation omitted).

The SBC and the Credentials Committee argue that the Garners' claims fall within the scope of the ecclesiastical abstention doctrine because they "necessarily involve the impermissible secular determination as to whether" the inquiry into whether Everett Hills was in friendly cooperation with the SBC "was proper." We do not agree. The conduct at issue is the Appellants' purported publication of written and oral statements that Mr. Garner was "an individual with an alleged history of abuse" and that the allegation was credible, while failing to also state that "the allegation[ was] made through an anonymous online portal" and that the Appellants "had not made any inquiry into the veracity of the anonymous report, or that no evidence supported the anonymous report." Unlike the diocese in *Lubbock*, the Appellants in this case have not raised any argument that their conduct resulted from the application or interpretation of any religious canon. Moreover, any argument by the Appellants that the Letter was sent as part of a pastoral disciplinary process is undercut by the concession of the SBC and the Credentials Committee that "[t]he Credentials Committee does not 'investigate what occurred or judge the culpability of an accused individual,' but rather only reviews 'how the SBC church responded to sexual abuse allegations and make[s] recommendations as to whether those actions or inactions are consistent with the SBC's beliefs regarding sexual abuse.'"

Ultimately, whether Everett Hills was in friendly cooperation with the SBC has no bearing on the Garners' claims. Accordingly, considering the Garners' claims will not require the trial court to resolve any religious disputes or to rely on religious doctrine. The

ecclesiastical abstention doctrine does not apply to this case, and the trial court did not err in denying the Appellants' Rule 12 motions.

## II. Tennessee Public Participation Act

### a.

The remainder of the Appellants' issues require us to construe the TPPA, Tennessee Code Annotated section 20-17-101, *et seq*. "[W]hen an issue on appeal requires statutory interpretation, we review the trial court's decision de novo with no presumption of correctness." *Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas and Water*, 578 S.W.3d 26, 30 (Tenn. Ct. App. 2018) (citing *Wade v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 469 S.W.3d 54, 58 (Tenn. Ct. App. 2015)). The polestar of statutory interpretation is the intent and purpose of the legislature in enacting the statute. *Id.* We begin by "reading the words of the statutes using their plain and ordinary meaning in the context in which the words appear." *Id.* When the language is clear and unambiguous, we look no further than the language of the statute itself to determine its meaning. *Id.*

The TPPA sets forth a burden-shifting framework that must be applied by trial courts when disposing of TPPA petitions. First, "[t]he petitioning party has the burden of making a prima facie case that a legal action against the petitioning party is based on, relates to, or is in response to that party's exercise of the right to free speech, right to petition, or right of association." Tenn. Code Ann. § 20-17-105(a). When deciding a TPPA petition, a trial court "may base its decision on supporting and opposing sworn affidavits stating admissible evidence upon which the liability or defense is based and on other admissible evidence presented by the parties." Tenn. Code Ann. § 20-17-105(d).

### b.

The Appellants argue that the trial court erred in concluding that the TPPA does not apply to the Garners' claims. They posit the TPPA applies to the Garners' claims because the claims involve a matter of public concern and relate to the Appellants' exercise of the right of free speech and right of association. Specifically, the Executive Committee and Ms. Peters argue that the Letter[6] "undoubtedly relates to health and safety and/or the

---

[6] For the purposes of this opinion, we concern ourselves only with the portion of the Garners' claims that arises out of the Letter. A review of the Appellants' principal appellate briefs reveals that they did not raise any issue or articulate any argument that the trial court erred in its rulings with respect to the Oral Statements made by Ms. Peters. In fact, none of the Appellants even mention the Oral Statements in their principal appellate briefs. The Appellants address the Oral Statements in their reply briefs; however, "[i]ssues raised for the first time in a reply brief are waived." *Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 724 (Tenn. 2017) (citing *State v. Banks*, No. W2014-02195-CCA-R3-CD, 2016 WL 369562, at *10 (Tenn. Crim. App. Jan. 29, 2016); *State v. Fitzpatrick*, No. E2014-01864-CCA-R3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015)). Accordingly, the Appellants have waived any argument

community's well-being" because it "is an inquiry initiated out of an allegation of sexual assault of a minor by [Mr.] Garner, who was employed as a music minister at Everett Hills while concurrently serving as a children's music minister at The King's Academy." The Garners respond that the Statements "do[] not involve a public concern, but rather . . . a private concern among the associated entities of the SBC, the Executive Committee, and the affiliated churches."

For purposes of the TPPA, matters of public concern include issues related to: "(A) Health or safety; (B) Environmental, economic, or community well-being; (C) The government; (D) A public official or public figure; (E) A good, product, or service in the marketplace; (F) A literary, musical, artistic, political, theatrical, or audiovisual work; or (G) Any other matter deemed by a court to involve a matter of public concern[.]" Tenn. Code Ann. § 20-17-103(6). Although the Letter was, on its face, an inquiry into whether Everett Hills was in friendly cooperation with the SBC, the subject matter of the purportedly defamatory statements therein was an alleged sexual assault. "[S]exual assault is clearly an issue related to 'health or safety[.]'" *Doe v. Roe*, 638 S.W.3d 614, 622 (Tenn. Ct. App. 2021). Therefore, for TPPA purposes, the subject matter of the Letter was a matter of public concern. Because the Letter was "a communication made in connection with a matter of public concern," we agree with the Appellants that the Garners' claims relate to the Appellants' exercise of the right of free speech and fall within the scope of the TPPA. *See* Tenn. Code Ann. §§ 20-17-103(3), 20-17-105(a).[7]

---

that the trial court erred in denying their TPPA petitions as they relate to Mr. Garner's claims arising out of the Oral Statements.

[7] The Appellants also argue that the claims relate to the Appellants' exercise of the right of association. For purposes of the TPPA, "'[e]xercise of the right of association' means exercise of the constitutional right to join together *to take collective action* on a matter of public concern[.]" Tenn. Code Ann. § 20-17-103(2) (emphasis added). The Appellants' briefing on this issue is skeletal and unsupported by legal authority as it is unclear what "collective action" they were taking. The SBC and the Credentials Committee do not make any attempt to explain what collective action was being taken. The Executive Committee and Ms. Peters simply argue:

> Second, the right of association is also implicated because the communication at issue here relates to the "constitutional right to join together to take collective action on a matter of public concern." Tenn. Code Ann. § 20-17-103(2). As referenced above, the purpose of the Credentials Committee is to review submissions from sexual abuse survivors and others alleging that specific churches are not in friendly cooperation with the SBC, a cooperative of almost 50,000 churches across the country with "over 14 million persons." The Credentials Committee must review all information available to it in making this determination, including "mak[ing] inquiries of a church." If the Credentials Committee finds that the church made the subject of the inquiry is not in friendly cooperation, the church is subject to disfellowship from the SBC. Therefore, there can be little question that the right of association fits within the TPPA's framework. *See* Tenn. Code Ann. § 20-17-103(2).

Accordingly, the trial court erred in finding that the TPPA "does not apply to this case." We reverse this portion of the trial court's order. Our analysis of the trial court's ruling does not end here, however, because it went on to find, alternatively, "that even if the [TPPA] did apply, [the Garners] have carried their burden of proving a prima facie case of each essential element of" their claims. We proceed to consider whether the Garners sufficiently met their burden under the TPPA's burden-shifting framework.

*c.*

Under the TPPA burden-shifting framework, the burden next shifts to the Garners to "establish[] a prima facie case for each essential element of the claim[s] in the legal action." Tenn. Code Ann. § 20-17-105(b). Despite its ultimate conclusion that the TPPA does not apply to this case, the hearing transcript, which the trial court incorporated by reference into its order denying the TPPA petitions, contains a lengthy recitation by the trial court of the reasons for its findings that the Garners established a prima facie case for each essential element of their claims. The Appellants argue these findings were in error.

The Appellants first argue that the trial court erroneously applied an incorrect legal standard throughout its analysis and ruling by treating the Garners' allegations as true. The hearing transcript reflects that at the beginning of its ruling on the TPPA petitions, the trial court stated: "[O]n a Motion to Dismiss, I have to look at the allegations in the Complaint as true." Later, it stated: "I must take as true today, the allegations in this Complaint that this anonymous report under the allegations of the Complaint was not investigated at all." The Appellants argue that this standard differs from the "prima facie" standard required by the TPPA. Shortly after the parties filed their briefs in this case, the Tennessee Supreme Court addressed this issue in *Charles v. McQueen*, 693 S.W.3d 262 (Tenn. 2024). As the High Court explained in *Charles*:

> To establish a "prima facie" case under the TPPA, a party must present enough evidence to allow the jury to rule in his favor on that issue. This evidence may include "sworn affidavits stating admissible evidence" and "other admissible evidence." Tenn. Code Ann. § 20-17-105(d). As is the case when a court rules on a motion for summary judgment or motion for directed verdict, the court should view the evidence in the light most

---

(Internal record citations omitted). Tennessee Rule of Appellate Procedure 27(a) requires that an appellant's brief contain an argument setting forth, *inter alia*, "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities . . ." Where a party makes no argument or cites no authority in support of his issues, or "where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). Because the Appellants failed to develop more than a skeletal argument as to what collective action they were taking, we cannot find that this matter relates to their exercise of the right to association.

favorable to the party seeking to establish the prima facie case and disregard countervailing evidence. *See, e.g., Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 284 (Tenn. 2005) (summary judgment); *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (directed verdict).

In determining whether a rational jury could find in the party's favor on that issue, the court also must keep in mind the applicable standard of proof. Here, a jury could find in favor of [the plaintiff] on the actual malice element of his defamation and false light claims only if it were to conclude that [the plaintiff] had established that element by clear and convincing evidence. *Cf. Sanford v. Waugh & Co.*, 328 S.W.3d 836, 848 (Tenn. 2010) (explaining that, because punitive damages require proof by clear and convincing evidence, in reviewing a motion for directed verdict on punitive damages, "a court must determine whether there is sufficient evidence, using the clear and convincing evidence standard, to submit the punitive damage claim to the jury" (quoting *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 207 (Tenn. Ct. App. 2008))).

*Charles*, 693 S.W.3d at 281. In short, when determining whether a party has met their prima facie burden under the TPPA, the trial court "should view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence." *Id*. There is no meaningful difference between this standard and the Rule 12 standard, which requires the trial court to treat the allegations in the complaint as true.

*i. Defamation and Defamation by Implication*

"To establish a prima facie case, the plaintiff in a defamation action must establish '1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'" *Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3-CV, 2013 WL 175807, at *5 (Tenn. Ct. App. Jan. 16, 2013) (quoting *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999)). "Only false statements are actionable, and truth is a nearly universal defense." *Id.* (citing *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001)). Truth is not always a defense, however:

Defamation by implication is another mechanism by which plaintiffs may prove defamation. Tennessee law provides that a statement may be capable of defamatory meaning even if the words do not appear defamatory

on their face, but instead imply or suggest a defamatory meaning. *See Pate v. Serv. Merck. Co.*, 959 S.W.2d 569 (Tenn. Ct. App. 1996).

> Defamation by implication occurs when statements that are true are nevertheless actionable if they imply facts that are not true. *Aegis Sciences*, No. M2012-00898-COA-R3-CV, 2013 WL 175807, at *11 (Tenn. Ct. App. Jan. 16, 2013).

*Grant v. Commercial Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *11–12 (Tenn. Ct. App. Sept. 18, 2015) (footnote omitted), *abrogated on other grounds by Funk v. Scripps Media, Inc.*, 570 S.W.3d 205 (Tenn. 2019).

The Appellants argue that the Garners cannot satisfy the second element of their defamation claim because the statements in the Letter – specifically, that an anonymous online complaint about Mr. Garner was made to Guidepost – are true. However, "[t]ruth is available as an absolute defense *only when the defamatory meaning conveyed by the words is true.*" *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) (citing *Brown v. First National Bank*, 193 N.W.2d 547, 553 (Iowa 1972)).

"[W]hether a statement 'is capable of conveying a defamatory meaning' presents a question of law." *Aegis Scis.*, 2013 WL 175807, at *6 (quoting *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)). As this Court explained in *Aegis Sciences*:

> A statement alleged to be defamatory must be judged within the context in which it was made. [*Revis*, 31 S.W.3d at 253]. Additionally, the statement "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." *Id.* (citations omitted). A trial court may determine that, as a matter of law, a statement is not defamatory *only when* "the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." *Biltcliffe*[ *v. Hailey's Harbor, Inc.*, No. M2003-02408-COA-R3-CV], 2005 WL 2860164, at *4[ (Tenn. Ct. App. Oct. 27, 2005)] (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)).

*Id.* (emphasis added).

The Letter states that Everett Hills "may employ an individual with an alleged history of abuse." It then goes on to ask whether Everett Hills has "received any allegations of sexual misconduct involving [Mr.] Garner" prior to being contacted by the Credentials Committee and whether Everett Hills was "aware of an allegation of sexual assault of a minor involving [Mr.] Garner during the time he served at Englewood Baptist Church[.]" Read in context, a person of ordinary intelligence could understand these statements to

mean not that a single recent anonymous allegation had been made against Mr. Garner, but instead that Mr. Garner was "an individual with an alleged history of abuse" dating back to the time when Mr. Garner had been employed at Englewood Baptist Church, approximately a decade before the anonymous allegation at issue was made to Guidepost. The statements in the Letter as published "would have a different effect on the mind of the reader from that which" a full explanation of the facts known to the Appellants at the time the Letter was sent would have produced. *See Memphis Pub. Co.*, 569 S.W.2d at 420. Accordingly, truth is not available as an absolute defense to the Appellants in this case. The trial court did not err in finding that Mr. Garner established a prima facie case for the second element of his defamation and defamation by implication claims.

Despite not arguing it in their principal briefs, the Executive Committee and Ms. Peters argue in their reply brief that they did not "ma[k]e an actionable 'statement' to sustain either of the defamation claims" because the Statements "were inquiries and not 'statements.'" Because this issue was raised for the first time in their reply brief, it has been waived. *See Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 724 (Tenn. 2017).

### ii. False Light

"[A]ctual malice is the appropriate standard for false light claims . . . when the claim is asserted by a private individual about a matter of public concern." *West*, 53 S.W.3d at 647. Actual malice requires "knowledge of the falsity of the statement or reckless disregard for the truth of the statement." *Id*. As such, to prevail on his false light claim, Mr. Garner "must prove that (1) a party gave publicity to a matter in a way that placed him in a false light; (2) 'the false light in which he was placed would be highly offensive to a reasonable person;' and (3) the [Appellants] 'had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which he would be placed.'" *Charles*, 693 S.W.3d at 280 (quoting *West*, 53 S.W.3d at 643–44). The Appellants suggest that the trial court applied an incorrect standard when analyzing Mr. Garner's false light claim because it noted:

> I don't think [Mr. Garner] is a public official or a public figure, so we are looking at whether or not he inserted himself or involved himself in a matter of public concern . . . It seems to me [Mr. Garner] was injected. He didn't try to involve himself into that public controversy. He was drug into it through no action of his own.

Despite this finding, however, the trial court applied the correct standard when it found that Mr. Garner established a prima facie case for false light

because the false light that someone potentially abused a minor would be highly offensive to a reasonable person, certainly if there was no investigation. There would have been action and *reckless disregard*. There would be *reckless disregard* potentially in terms of holding someone up to contempt or ridicule, or putting someone in a position of disgrace.

(Emphasis added). Accordingly, the trial court did not apply an incorrect standard when analyzing Mr. Garner's false light claim.

The Executive Committee and Ms. Peters also argue that Mr. Garner cannot show that the Appellants gave "publicity" to a matter in a way that placed him in a false light because the Letter "was not a public communication." Publicity means

that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.

*Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 53 (Tenn. Ct. App. 2013) (quoting *Secured Fin. Sols., LLC v. Winer*, No. M2009-00885-COA-R3-CV, 2010 WL 334644, at *4 (Tenn. Ct. App. Jan. 28, 2010)). Thus, the publicity requirement is not satisfied by the communication of "a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Id*.

Mr. Garner alleges that Ms. Peters emailed the Letter to Mr. Hayes and to Randy Davis, president of the Tennessee Baptist Mission Board. He argues that he was in a special relationship with these individuals because they could hire and fire him, and, thus, the special relationship exception should apply to satisfy the publicity requirement. This Court discussed the special relationship exception in *Christian Bros. Univ.*:

In his brief, Mr. Brown cites a footnote from this Court's opinion in *Brown v. Mapco*, which states that "the publicity requirement for a false light claim may be satisfied by establishing that the false and highly offensive information was disclosed to a person or persons with whom the plaintiff has a special relationship." *Brown v. Mapco*[ *Exp., Inc.*], 393 S.W.3d[ 696,] 707 n. 4[ (Tenn. Ct. App. 2012)] (citing 62 A Am.Jur.2d *Privacy* § 141). The "special relationship" exception to the publicity requirement was explained in *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill.App.3d 731, 245 Ill.Dec. 465, 728 N.E.2d 547 (2000), which was cited in 62A Am.Jur.2d *Privacy* § 141. In *Poulos*, the plaintiff, a school teacher, was investigated for sexual abuse of one of the foster children in plaintiff's care. *Id.* 245 Ill.Dec.

465, 728 N.E.2d at 552–53. The *Poulos* plaintiff alleged that the social worker, who was employed by the defendant, contacted the chairman of the board of the school where plaintiff was employed and advised the chairman of the allegations of sexual abuse that had been made against the plaintiff. *Id.* The plaintiff was subsequently fired by the school. *Id.* 245 Ill.Dec. 465, 728 N.E.2d at 552. The plaintiff was eventually cleared of all charges of sexual abuse. *Id.* The Illinois appellate court found that the plaintiff had a special relationship with the board chairman because he was responsible for hiring and firing decisions for the plaintiff's employer, the school. *Id.* 245 Ill.Dec. 465, 728 N.E.2d at 556.

*Christian Bros. Univ.*, 428 S.W.3d at 53. Ultimately, this Court found that there was no special relationship between the relevant parties in those cases. *See id.* at 54 (finding no special relationship between the plaintiff and his friend to whom the statements at issue were made); *see also Mapco*, 393 S.W.3d at 707 n.4 (finding no special relationship between the plaintiff and unidentified store customers who may have overheard the statement at issue). Conversely, we are persuaded that the special relationship exception applies in this case.

The special relationship exception "is both justified and appropriate in that a disclosure to a limited number of persons may be just as devastating to a plaintiff as a disclosure to the general public." *Poulos*, 728 N.E.2d at 555. In this case, the subject matter of the Letter was an allegation of sexual assault of a minor against Mr. Garner, who was employed as a worship pastor at Everett Hills and was a music minister at a Baptist affiliated school. The Letter was sent to the senior pastor at Everett Hills, who was directly responsible for the hiring and firing of Mr. Garner, and to the president of the Tennessee Baptist Mission Board. Given the subject matter of the statements and the individuals to whom the Letter was sent, there is no doubt that the disclosure to these two individuals may be just as devastating to Mr. Garner as would be a disclosure to the general public. Accordingly, the special relationship exception applies in this case, and the trial court did not err in finding that Mr. Garner satisfied the publicity element of his false light claim.

*d.*

Finally, the last step of the TPPA burden-shifting framework provides that the trial court "shall dismiss the legal action if the petitioning party establishes a valid defense to the claims in the legal action." Tenn. Code Ann. § 20-17-105(c). The Executive Committee and Ms. Peters argue that the trial court erred in failing to consider whether they had a valid defense to the Garners' claims. They argue that "at a minimum, the trial court's order must be reversed and remanded so that it can complete step three of the TPPA analysis." They then go on to argue that their valid defense is that the statements were true. The truth or falsity of an allegedly defamatory statement is properly addressed in step two

- 22 -

of the burden-shifting framework, when the burden is on the plaintiff to establish a prima facie case for every essential element of their claim. *Garner v. Thomason, Hendrix, Harvey, Johnson & Mitchell, PLLC*, No. W2022-01636-COA-R3-CV, 2024 WL 1618897, at *10 (Tenn. Ct. App. Apr. 15, 2024), *perm. app. granted*, No. W2022-01636-SC-R11-CV, 2024 WL 4021932 (Tenn. Aug. 28, 2024). Moreover, as discussed at length above, because Mr. Garner has established a prima facie case of defamation by implication, the truth is not a defense in this case.

The Appellants have requested their attorney's fees incurred at the trial court, in this appeal, and on remand pursuant to Tennessee Code Annotated section 20-17-107. However, because the legal action has not been dismissed, the Appellants are not entitled to such fees.

## CONCLUSION

For all these reasons, we reverse in part and affirm in part the judgment of the Circuit Court for Blount County. Costs of this appeal are taxed jointly and severally to the appellants, Southern Baptist Convention, the Credentials Committee of the Southern Baptist Convention, the Executive Committee of the Southern Baptist Convention, and Christy Peters, for which execution may issue if necessary. This case is remanded for further proceedings consistent with this Court's opinion.

_____
KRISTI M. DAVIS, JUDGE